**Ross SANGER, et al., Plaintiffs,**

v.

**MONTGOMERY COUNTY BOARD OF EDUCATION, et al., Defendants.**

**Civil No. PJM 93–915.**

United States District Court,
D. Maryland.

Feb. 28, 1996.

Matthew B. Bogin and Michael J. Eig, Bogin & Eig, Washington, DC, for plaintiffs.

David C. Hjortsberg and Judith S. Bresler, Reese & Carney, Columbia, MD, Zvi Greismann, Montgomery County Public Schools, Rockville, MD, JoAnn Grozuczak Goedert, J. Joseph Curran, Jr., Office of Attorney General, Baltimore, MD, for defendants.

## OPINION

MESSITTE, District Judge.

### I.

Ross Sanger's parents ask that the Montgomery County Board of Education reimburse them for the cost of Ross' placement at the Grove School in Madison, Connecticut, a residential facility for emotionally disturbed children.[1] Their request is made pursuant to the Individuals With Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* and related Maryland statutes, Md. Code Ann. Ed. Art. § 8–401 et seq. Because the State Review Board denied their request, the Sangers have sought relief in this Court. *See* 20 U.S.C. § 1415. The Court will also deny the requested reimbursement.

### II.

■ In IDEA compliance proceedings the two part-inquiry is this:

The State Defendants were not parties to the 1991–92 dispute between the Sangers and the County Defendants concerning Ross' placement and their presence in this suit is something of a mystery. The Sangers do not argue that the State should have participated under IDEA nor do they allege that the State has committed any IDEA violations. Judgment in favor of the State Defendants is appropriate on this basis alone.

---

1. Also named as Defendants are Paul Vance in his official capacity as Superintendent of Montgomery County Public Schools (MCPS), the Maryland State Department of Education, and Nancy S. Grasmick in her official capacity as Superintendent of the Maryland State Department of Education. For the sake of convenience, the Montgomery County authorities will be referred to collectively as MCPS.

First, has the [educational agency] complied with the procedures set forth in the Act? And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the [agency] has complied with the obligations imposed by Congress and the courts can require no more. (Footnotes omitted)

*Board of Education of Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982) (hereinafter *Board of Education v. Rowley* ).

The Court begins with a brief review of the statutory framework under IDEA.

Under the Act, children with disabilities, which include serious emotional disturbances, 20 U.S.C. § 1401(a)(1)(A), are assured a "free appropriate public education" (FAPE), § 1412(1). The goal of IDEA is that each child should receive an education appropriate to his or her unique needs, though this does not necessarily mean one that maximizes individual potential. *Board of Education v. Rowley,* 458 U.S. at 199, 102 S.Ct. at 3047. Moreover, the Act distinguishes between the child's educational needs, as to which the Act insures funding, and the child's medical needs, which are ordinarily the financial responsibility of the child's parents. *Tice v. Botetourt County School Board,* 908 F.2d 1200, 1208–09 (4th Cir.1990); *Clovis Unified School District v. California Office of Administrative Hearings,* 903 F.2d 635 (9th Cir.1990).

To the maximum extent possible, IDEA seeks to mainstream the child into regular public school, but in any case to place the child in the "least restrictive environment" consistent with his or her educational needs. 20 U.S.C. § 1412(5)(B).

In order to attain the goal of a FAPE, the Act contemplates the formulation of a written statement of a child's special education needs, known as an "individualized education program" (IEP), § 1401(a)(20), which must be reviewed annually and, where appropriate, revised. § 1414(a)(5). The IEP is supposed to be the joint product of discussions among the child's parents, teachers, and local school officials and must specify goals and short-term objectives for the child, any related services, and the criteria and evaluation procedures that will be used. § 1401(a)(20)(A)–(F); COMAR 13.A.05.01.09. In Maryland, an IEP is approved by what is known as an Admission, Review, and Dismissal Committee.[2] *See* COMAR 13A.05.01.08 and .09. Parental involvement in these CARD discussions is critical. The Act thus provides parents with important procedural safeguards in connection with the review process should they disagree with a proposed IEP, including the right to a "due process" hearing before a local hearing officer, § 1415(b), the right to review by a state review board, § 1415(c), and ultimately the right to review by way of suit in the United States District Court. § 1415(e)(2).

In the event that it becomes appropriate to modify an IEP in the middle of the school year, the Act contemplates that the same procedures will be followed. Again, should parents be dissatisfied with any IEP decision, a state administrative hearing and appeal may be pursued, after which suit may be filed in the United States District Court.

Ross Sanger's parents followed a somewhat different course, one which, as the Court will discuss, has significant implications for their entitlement to reimbursement. First, however, the Court considers the standard of review to be applied in cases such as this.

### III.

■ In *Board of Education v. Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051, the United States Supreme Court established that, in reviewing administrative decisions in IDEA cases, the district court must make an independent decision based on a preponderance of the evidence, while giving due weight to the state administrative proceedings. In *Doyle v. Arlington County School Bd.,* 953

---

**2.** Although one might suppose the acronym for this Committee would be "ARDC", the common practice has been to refer to the Committee as "CARD", which is the form that will be used in this Opinion.

F.2d 100 (4th Cir.1992), the Fourth Circuit elaborated on the "due weight" requirement. *Doyle* requires that due weight must be accorded to the findings of fact of the hearing officer, which are entitled to *prima facie* correctness, while the district court, if it is not going to follow those findings, must explain why not. 953 F.2d at 105. The Court's deference also extends to the hearing officer's findings regarding the school board's compliance *vel non* with the procedural requirements of IDEA. 953 F.2d at 106, n. 6. When both the hearing officer and the state review authority agree on the issues, even greater deference is due. *Combs v. School Board of Rockingham County*, 15 F.3d 357, 361 (4th Cir.1994). The district court, however, may consider the entire record developed below as well as any additional evidence presented in the district court itself. 20 U.S.C. § 1415(e)(2). The burden of proof is on the party challenging the state administrative proceedings, *Tice v. Botetourt County School Board*, 908 F.2d at 1206, n. 5.

## IV.

In the present case, the hearing officer determined that the Sangers should receive no reimbursement from MCPS for Ross' placement for the period February 10 through April 27, 1992, a decision with which the State Review Board agreed.

However, for the period April 27 through August 31, 1992, the hearing officer ordered reimbursement, a finding the State Review Board disagreed with and reversed.

Finally, both the hearing officer and the State Review Board determined that the FAPE Ross was entitled to for the school year beginning September 1, 1992, could be afforded by a residential placement at the Regional Institute for Children and Adolescents (RICA) in Rockville; accordingly they ordered no reimbursement for Grove for that period.

Before the Court, the Sangers ask that the hearing officer's findings for the April 27 to August 31, 1992 period be upheld, but that all other conclusions of the hearing officer and the State Review Board be rejected. They claim that MCPS denied Ross a FAPE; specifically, that it failed to develop a timely and appropriate IEP for him, failed to identify his need for residential services, and failed to advise the Sangers of what program it was in fact offering. MCPS denies these allegations *en toto* and asks the Court to embrace the conclusions of the State Review Board.

## V.

There is no question that Ross Sanger, seventeen years old when this claim arose, was a severely emotionally disturbed child. He had been this way since infancy, displaying a variety of obsessive/compulsive symptoms on a continuous basis.

When he was in eighth and ninth grades, he attended Sandy Spring Friends School in Montgomery County, a private institution chosen by his parents. MCPS was never asked and in fact in no way contributed to the cost of that placement.

By the time Ross was ready for tenth grade, his parents sought to obtain for him the FAPE he was unquestionably entitled to receive. The IEP developed for Ross determined that he would benefit from placement at a Level V intensity facility,[3] specifically the Robert Frost Middle School in Rockville.

Ross performed well at Frost, receiving mostly As and Bs. He performed well enough, in fact, that by November of 1991, both he and his parents were seeking to have him leave Frost and enroll at Winston Churchill School, a "mainstream" public high school in his neighborhood. Mrs. Sanger went so far as to request MCPS to consider changing Ross' status from "severely emotionally disturbed" to "learning disabled." Indeed, in December 1991, without advising

---

**3.** Under COMAR 13A.05.01.10(E):

(6) Intensity V may be considered appropriate for the student who requires a more intensive special education program than Intensities I–IV. The maximum class size ... is an average of 6 students ... per full-time certified special education teacher ...

(7) Intensity VI may be considered appropriate for the student who requires special education programming and related services in a residential setting ... The maximum class size ... is an average of 4 students ... per full-time certified or licensed professional.

MCPS, Mr. and Mrs. Sanger had Ross evaluated by Dr. William Stixrud, who submitted a report indicating that, in his judgment, Ross was an appropriate candidate for mainstreaming at Churchill. Although MCPS officials were resistant to the idea that Ross might be ready to be mainstreamed, they nevertheless, through Rita Sheare, a special education officer, agreed to set up a CARD meeting to discuss possible modification of Ross' placement. The Sangers were offered several dates for the meeting in early 1992, specifically January 14, January 27, and January 28, the latter date being selected.

A critical intervening event caused Mrs. Sanger to cancel the January 28 meeting.

On January 12, Ross took a car to school, and against school policy gave a classmate a ride home at the end of the school day. On the way home, Ross had an accident with another car in which one of its passengers, a baby, was injured, albeit slightly. This incident, together with other events of accumulating stress in his life, triggered an extreme reaction in Ross. Soon after, on January 15, he attempted suicide by taking an overdose of Prozac. Fortunately, his parents managed a timely intervention and took him to Shady Grove Hospital in Rockville. On January 19, Ross was transferred to Sheppard–Pratt Hospital, a psychiatric facility in Baltimore.

Medical personnel at Sheppard–Pratt advised the Sangers that Ross was presenting as a candidate for extended residential placement. The staff recommended several possibilities to the Sangers, one of which was the Grove School in Madison, Connecticut, a 24-hour therapeutic-educational facility. The Sangers did not hesitate. Without prior approval of MCPS, they unilaterally decided to place Ross in Grove directly upon his release from Sheppard Pratt.[4] Actual placement occurred on February 6.

By telephone on February 10, confirmed by letter dated February 11, the Sangers formally and cordially notified MCPS that Ross was being withdrawn from MCPS. ("Ross should no longer be considered a student at the Frost School . . . Thank you for the time you have spent helping us.")

From the date of that letter until approximately March 9, nothing was asked of the County nor did it take any action on Ross' behalf. On or about March 9, however, despite the fact that the Sangers had repeatedly cancelled CARD meetings and failed to afford MCPS the opportunity to revisit Ross' IEP, counsel for the Sangers filed an application for a due process hearing, alleging that MCPS had failed to evaluate Ross or to provide him with services in a residential setting.

MCPS submitted what it believed was an appropriate response. First it sought first to convene an IEP meeting, which was in fact held on March 21. Further, on April 2, Dr. Stanley A. Sirotkin, diagnostic supervisor for MCPS, wrote to the Sangers' counsel requesting current medical information for Ross and suggesting that a CARD meeting be held at a mutually convenient date. The Sangers, however, demurred, insisting that the matter proceed directly to a due process hearing. Reluctantly MCPS agreed and a due process hearing went forward on April 15. Not surprisingly, the hearing officer recommended that the proceeding be adjourned so that a CARD meeting could take place. The Sangers, while not objecting, emphasized that they sought funding at the Grove School and that nothing else would do.

The CARD meeting convened on April 27. The Sangers though not present, were represented by counsel who again suggested that a residential placement was required for educational purposes and that Grove was the only suitable location. The CARD disagreed. Although all parties agreed that the existing goals and objectives of the 1991–92 IEP remained appropriate and hence wrote Ross'

---

**4.** It appears that by telephone prior to the placement the Sangers informally advised Rita Sheare, who had been Ross' caseworker while he was at Frost, that they intended to make a private residential placement. The Sangers say Sheare stated that MCPS would not pay for the placement, a response which the Sangers characterize as a refusal on the part of MCPS to modify Ross' IEP. On the other hand, it is undisputed that Sheare attempted yet again to schedule CARD meetings, this time for February 4 and February 11, both dates Mrs. Sanger tentatively agreed to, then cancelled.

IEP for the remainder of the school year with those goals and objectives in mind,[5] the CARD noted that Ross' placement at Grove and any need he might have for residential placement were based on family, not educational needs. In particular, family therapy was seen as a critical component. The Committee observed that Ross had been progressing reasonably well at Frost and that no professional, school staff, or even the Sangers themselves had suspected suicidal ideation. Although the CARD recommended an Intensity V nonpublic placement for Ross, one which would provide him with high level attention but in a non-residential setting, the Committee expressly acknowledged to the Sangers' counsel that a residential placement could be considered whereby MCPS would provide the educational component of the residential placement and the Sangers would fund the non-educational therapeutic component (the so-called "Family Clause Option"). The Sangers rejected that option. Even so, the CARD advised the Sangers, both at the CARD meeting and by letter sent shortly after, that it was amenable to referring the question of a possible "residential" placement for Ross to the Local Coordinating Council (LCC). At the LCC meeting on May 27 the Sangers were again represented by counsel and again requested funding at Grove. By letter dated June 10, however, the LCC advised the Sangers that if a residential placement were sought, an appropriate placement could be made in the Sangers' home community and suggested a possible placement at RICA in Rockville. RICA in fact offered a residential setting for the provision of educational services at an Intensity V level.

The Sangers chose not to respond to the June 10 letter;[6] in consequence no interview was held at RICA and the matter never returned to CARD for a placement decision.

Meanwhile the Sangers pressed on to complete the due process hearing adjourned from April 15. As it happened, the hearing officer who had sat on April 15 became ill and indicated her unavailability to sit again until mid-July. MCPS, sensing the urgency of the situation, requested that another hearing officer be substituted for her, but the Sangers refused. Accordingly, the due process hearing did not resume until July 15. During this time Ross remained at Grove, where the school year would run until August 31.

The hearing officer's decision issued on August 8, though apparently it was not received by the Sangers until August 17. Her opinion began by recognizing that an undisputed IEP was in place for Ross as of the time of his attempted suicide. She then held that the Sangers had unilaterally placed Ross at Grove, with the result that they were no longer seeking a FAPE for him. She went on to suggest, however, that as of March 9, the date of their lawyer's demand for a due process hearing, the Sangers were reasserting a claim for a FAPE for Ross. Recounting the procedural history of the case, the hearing officer identified April 27, the date of the CARD meeting, as the critical date in the

---

5. The projected end date for the IEP was June, 1992.

6. The June 10 letter read:
   Dear Mr. and Mrs. Sanger:
   On May 27, 1992, the Montgomery County Local Coordinating Council (LCC) met to discuss your child's need for residential services. The Council recommended that Ross' needs can be met in his home community. They recommended consideration of placement at the Regional Institute for Children and Adolescents. The Council felt strongly that placement within the community would allow for Ross to address his family relationships and to develop community supports.
   Please contact Ms. Rita Sheare, placement specialist, at 279–3181 to begin the RICA process and to discuss other options that are available in the community.

Very truly yours,
Mary Lee Phelps, Supervisor
Central Placement Unit

The Sangers maintain that the letter was unclear whether a residential placement was being recommended and cite this as justification for their failure to follow up and explore the RICA option. While the State Review Board agreed that the letter did not specify a residential placement at RICA, it faulted the Sangers for failing to seek clarification.

The hearing officer found the letter unclear not as to whether a residential placement was being offered, but whether it was being offered for noneducational as opposed to educational reasons. She relied on this purported lack of clarity, at least in part, to justify her recommendation that MCPS should reimburse the Sangers for the period April 27 to August 31.

sequence. Because the Sangers, prior to that date, had unilaterally placed Ross at Grove, and had sought a due process hearing out of sequence and only at her instance had acquiesced in the CARD meeting, the hearing officer reasoned that MCPS should not be liable for the Grove placement up to April 27.

In contrast, for the period April 27 until August 31, 1992, the latter being the end of the school year at Grove, the hearing officer recommended that the placement at Grove be reimbursed. She assumed over this period that Ross was entitled to a FAPE, that a residential placement for educational purposes was appropriate, and implicitly that placement at Grove was appropriate for those purposes. Because MCPS, at the CARD meeting and in the days after, had either not recommended a residential placement for educational purposes or had been unclear about it, the hearing officer felt that MCPS should reimburse for the Grove placement from the date of the CARD meeting until the end of the school year then in progress, April 27 to August 31.

However, for the school year that would begin on or about September 1, 1992, the hearing officer took another sharp turn. She determined that while a residential placement for educational reasons was indicated for Ross, the appropriate placement would be at RICA in Rockville. RICA, she reasoned, had suitable facilities and could provide family therapy, a critical need in Ross' emotional program. In this regard, the proximity of RICA to Ross' home made it especially suitable when compared to Grove, some 300 miles away. At the same time, the hearing officer noted the anomaly of recommending a placement at RICA with Ross' IEP still partially incomplete and therefore recommended that any placement at RICA be followed as soon as possible by the development of an IEP for 1992–93, a situation she acknowledged was "putting the cart before the horse." More to the point, she did not recommend that reimbursement be paid to the Sangers for the school year beginning on or about September 1.

Ross began his senior year at Grove despite this. Some two months later, on Octo-

ber 29, pursuant to the hearing officer's directive, an IEP was finally completed which, not unexpectedly, recommended a residential placement at RICA.

In the meantime the Sangers, through counsel, had appealed the decision of the hearing officer to the State Review Board and MCPS had cross-appealed that portion of the decision directing reimbursement for the period April 27 through August 31. After several delays to accommodate the Sangers, the State Review Board met on December 4, 1992, to hear the appeals. The Board received in evidence the complete record of the proceedings below and heard live testimony from Mr. and Mrs. Sanger and Dr. Stixrud. No witnesses were called by MCPS.

On December 18, the Board issued its decision. It agreed with the hearing officer that a residential placement at RICA was ultimately the FAPE Ross should have received, but rejected her finding that the placement was necessitated for educational as opposed to noneducational reasons. It also concurred that for the period beginning with Ross' placement at Grove until April 27, the date of the CARD meeting, MCPS had no obligation to reimburse the Sangers because they had unilaterally withdrawn Ross from MCPS during that period. The Board disagreed with the hearing officer and reversed her decision regarding proposed reimbursement for the period April 27 through August 31, referring again to the unilaterality of the placement. It found that MCPS had been willing to consider a residential placement for Ross as of that time, specifically at RICA, but that the Sangers had unreasonably resisted pursuing that option, in particular by failing to follow up on LCC's June 10 letter suggesting that an interview be held at RICA. In addition, the Board found that the Sangers had postponed hearings on several occasions. For these reasons, the Sangers' appeal was rejected, that of MCPS accepted. Reimbursement for Ross' placement at Grove School was denied in full.

## VI.

A) Pursuant to *Rowley,* the Court considers whether MCPS complied with the proce-

dures set forth in IDEA and whether the IEP developed for Ross was reasonably calculated to enable him to receive educational benefits.

Applying the *Doyle* standard, the Court accepts as correct certain factual findings of the hearing officer, other findings made by the State Review Board not inconsistent with those of the hearing officer, and still others of the Court's own making, some of which are consistent and others inconsistent with the findings of the hearing officer. To the extent that the Court rejects findings of the hearing officer or the State Review Board, it gives reasons for its departure.

B) It will simplify discussion if the Court considers the second part of the *Rowley* inquiry first, *i.e.* whether the IEP developed for Ross was reasonably calculated to enable him to receive educational benefits.

■ 1) Assuming that the Sangers either continuously sought a FAPE for Ross following his placement at Grove or that on March 9, 1992, they reasserted his right to a FAPE after effectively disavowing it, both the hearing officer and the State Review Board eventually deemed a residential placement at RICA in Rockville to be the FAPE Ross was entitled to. The hearing officer lay particular stress upon Ross' need for family therapy, something that obviously could not be accomplished in a placement as far away as Grove in Connecticut. The State Review Board agreed, finding that a residential placement at RICA provided the least restrictive environment. In her testimony to the Court, Dr. Joan Benz, principal of RICA, described RICA's 7–day a week, 24–hour "therapeutic milieu," including community meetings, group therapy sessions, activity programs, and transitional arrangements for the resident child to reintegrate with his parents on weekends. Based on the dual state administrative findings and its own review of the record, the Court concludes that the FAPE Ross was entitled to was a residential placement at RICA.

2) But for the actions of the Sangers and their counsel, this FAPE might have been available to Ross as early as the Spring of 1992. Whatever their motives might have been, virtually every action they took had the effect of frustrating and deferring pursuit of the RICA option.

a) As both the hearing officer and the State Review Board found, and the Court now finds, the Sangers unilaterally withdrew Ross from MCPS in February, 1992, absolving MCPS for the time being of any obligation to consider modification of the valid IEP then in place.

b) Assuming the Sangers re-entered the educational process as of March 9, 1992, with their request for a due process hearing, until such time as a CARD meeting could be held to consider modification of the IEP (a meeting which the Sangers resisted and had to be directed to attend), there could be no liability on the part of the MCPS.

c) The Sangers passed up several opportunities to go before the CARD in January and February, 1992, each time delaying consideration of any change in Ross' placement.

d) Although the CARD concluded on April 27 that a Level V highly intense but nevertheless nonresidential placement for Ross was appropriate, it specifically advised the Sangers and their counsel in timely fashion that a residential placement at RICA remained a possibility. The Court concludes that the Sangers understood this but, if there was any doubt, it was incumbent upon them or their counsel to seek to clarify the matter.[7]

---

7. The Court makes its own finding in this regard. Given the history of the case, it was altogether clear that a residential placement at RICA was one possible, indeed probably the most likely, alternative being offered. From March, 1992 onward, the whole enterprise was about obtaining funding for a residential placement for Ross at Grove. Although the April 27 CARD meeting disagreed, the undeniable purpose of the May 27 LCC meeting was to consider a "residential" placement. The Family Clause Option was specifically discussed at that meeting, and RICA was specifically mentioned. Ross had been at Frost, a Level V non-residential setting, and his educational needs were, in the opinion of MCPS, being met there. The April 27 CARD meeting, in effect, agreed that a Level V, non-residential placement could still meet Ross' educational needs. Thus the June 10 letter, mentioning Ross' "need for residential" services and "consideration" of a placement at RICA clearly implied the possibility of a residential placement at RICA. For the Sangers and their counsel, a highly expe-

e) The fact that Ross' IEP for 1992–93 was not finally completed until October, 1992, is ultimately of marginal consequence. While completion of the IEP before placement is obviously the preferred norm, *see* 34 C.F.R. 300.342 [IEP to be in effect at beginning of school year], under the circumstances of this particular case any earlier rendering would have been futile. In the first place, the record suggests that the Sangers never pressed for a new IEP, a point the hearing officer expressly noted. More significantly, the Sangers were wedded to funding at Grove and nothing else. It thus would not have mattered in the least when RICA was written into the IEP because from the outset the Sangers made it clear that they would not accept it.

f) For the same reason, whether residential placement at RICA was for educational reasons (as the hearing officer found) or for noneducational reasons (as the State Review Board found) has little significance in the end. Either way, the Sangers would have resisted the placement; it was always Grove or nothing. But lest there be any doubt, the Court finds that residential placement at RICA would have been and the placement at Grove in fact was for noneducational reasons. The hearing officer, presumably referring to both the Grove and RICA placement, merely asserted her disagreement with the CARD's recommendation, declaring that, in her view, Ross needed an Intensity VI placement, *i.e.* a residential placement for educational reasons. But not only did the hearing officer fail to give reasons for her conclusion, her findings regarding the extreme deterioration of Ross' family situation as of that time actually pointed to a directly opposite conclusion. The State Review Board, in the Court's judgment, reasoned more persuasively as to the Grove placement. As the Board observed, Sheppard–Pratt had initially recommended that Ross be placed in a private, regular-education school. It recommended Grove only after determining that Ross was unable to commit to therapy or comply with his medication. Throughout, Sheppard–Pratt took note of Ross' history of oppositional

behavior at home. Although the State Review Board itself did little more than assert, contrary to the hearing officer, that a residential placement at RICA was indicated for noneducational reasons, ample evidence presented to the Court persuades that such a placement would indeed have been occasioned by noneducational considerations. Thus Mary Lee Phelps, supervisor of MCPS' central placement unit, testified that Ross had shown progress at Frost in a Level V program with therapy integrated. She emphasized that the objective is always appropriate placement in the least restrictive environment. Allowing that Ross' suicide crisis had been dealt with and given his highly charged family situation, she reasoned that any residential placement would have been dictated primarily by family concerns. The Court agrees, expressly rejecting the assertion of the hearing officer to the contrary. Since residential placement necessitated by emotional problems segregable from the learning process is not fundable, MCPS was not required to fund the Grove placement. *See Burke County Board of Education v. Denton*, 895 F.2d 973, 980 (4th Cir.1990). The Court concludes, as did both the hearing officer and the State Review Board, that a residential placement at RICA would have enabled Ross to receive educational benefits required by *Rowley*.

C) The Court considers the second prong of the *Rowley* inquiry, *i.e.* whether MCPS complied with the procedures set forth in IDEA.

■ To begin, some general perspectives are in order. First, the key consideration in any procedural analysis under IDEA is whether full and fair parental involvement in the review process had been afforded. *See e.g. Spielberg v. Henrico County Public Schools*, 853 F.2d 256, 259 (4th Cir.1988) ("the spirit and intent of the [statute] ... emphasizes parental involvement").

Second, to the extent that there may be failure to comply strictly with IDEA's procedures, the Court must consider whether the

---

rienced practitioner in IDEA cases, to suggest otherwise borders on the disingenuous. To have foregone even a phone call to seek clarification

and then to cite the failure of MCPS to offer Ross a program is nothing short of brazen.

failures have caused the loss of "educational opportunity" or are merely technical in nature. *Burke County Bd. of Educ. v. Denton,* 895 F.2d 973, 982 (4th Cir.1990).

■ From what has already been set forth, it should be clear, as a general proposition, that the Sangers had a full and fair involvement in the review process; if anything, they had the benefit of more than fair involvement. The issue of funding for Ross at Grove was considered at a due process hearing, a CARD hearing, an LCC hearing, and a State Review Board hearing, all in less than a year's time, *i.e.* from March 9 to December 18, 1992.[8] The Sangers' opportunity to be heard was never impeded in the least.

Moreover, getting down to specifics, their claim that MCPS never developed an IEP for Ross is totally groundless. Not only was Ross' 1991–92 IEP agreed to be of continuing validity following the Grove placement; the Sangers and their counsel blocked every effort by MCPS to develop a new one. This began with their cancellation of the January and February 1992 CARD meetings, followed by the unilateral withdrawal of Ross from MCPS, succeeded by their re-entry into the system wherein they immediately sought a due process hearing rather than giving MCPS "notice and the opportunity to rectify the situation." *See Combs v. School Bd. of Rockingham County,* 15 F.3d 357, 364 (1994) ("[T]he school district should have been given notice and the opportunity to rectify the situation before Combs brought an administrative action and subsequent lawsuit").[9]

Beyond that, as the hearing officer observed, the Sangers never raised the content of the IEP as an issue at the hearing before her. Indeed, to the extent they raised it post-hearing at all, it was essentially to reserve on a technical point. The Sangers knew full well where the hearing officer and

MCPS would come out and, more importantly, they knew that their quest for funding at Grove for 1992–93 would necessarily be decided when the State Review Board considered the propriety of Ross' placement for 1991–92. MCPS, in short, did not fail to develop an IEP for Ross Sanger for 1992–93; whatever delay there was in developing the IEP is attributable to the Sangers alone.

Contrary to the Sangers' claim, the Court also finds that MCPS told them in reasonable time what placement they had in mind for Ross, both for the spring term of 1991–92 and the full term of 1992–93. Although MCPS recommended a Level V nonresidential placement, it clearly offered the Sangers the option of pursuing a possible residential placement in Montgomery County, in particular at RICA. It was the Sangers who declined to pursue or even to clarify this option. MCPS committed no procedural violations on this account; Ross Sanger suffered no loss of "educational opportunity."

### VII.

■ Parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of school officials, may still seek reimbursement for any period in which the placement proposed by the school authority violated IDEA. *School Committee of Town of Burlington, Massachusetts v. Dept. of Educ. of Massachusetts,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Amann v. Stow School System,* 982 F.2d 644 (1st Cir.1992).[10] They do so, however, at their own risk; if the school authority's placement is ultimately deemed proper, the parents will not prevail.

The Sangers cannot prevail here. The placement MCPS proposed for Ross was entirely proper and, if it was slow in coming, this was due to no failure on its part. No violation of IDEA occurred. Based on the

---

**8.** Had the Sangers not postponed the State Review Board hearing on several occasions, the matter could have proceeded even more quickly.

**9.** The Sangers' effort to jump directly to a due process hearing in March, 1992, rather than engage in a CARD meeting, is especially troublesome. In the Court's view, as *Combs* suggests,

such an approach has the effect of short-circuiting the educational review process.

**10.** Whether the school is approved by the local educational agency is irrelevant so long as the placement is appropriate. *Florence County School District Four v. Carter,* —— U.S. ——, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

entire record, Plaintiffs' request for reimbursement will be DENIED.

A separate Order implementing this Opinion will issue.