**S. M., et al.  Plaintiffs**

v.

**Jerry D. WEAST,[1] et al.  Defendants**

**No. CIV. PJM 01–3431.**

United States District Court,
D. Maryland.

Jan. 13, 2003.

---

1. Defendant Weast is the Superintendent of the Montgomery County, Maryland Public School System (MCPS). Defendants will be referred to collectively hereinafter as "MCPS."

Michael J. Eig, Chevy Chase, MD, for Plaintiffs.

Jeffrey A. Krew, Columbia, MD, for Defendants.

## REVISED OPINION

MESSITTE, District Judge.

### I.

This is an action for reimbursement of the costs incurred by the parents of S.M. for her placement in a private school for disabled children for the 1998–99 school year. The parents claim that the Montgomery County Public School System (MCPS) failed to provide S.M. with a Free Appropriate Public Education (FAPE) as required under the Individuals with Disabilities Act (IDEA), 20 U.S.C. § 1400 *et seq.* Following a six-day administrative due process hearing, the Administrative Law Judge (ALJ) denied the parents' request. On appeal, the parents ask the Court to reverse the ALJ's decision.[2]

The parties have filed Cross–Motions for Summary Judgment.[3]

The Court will AFFIRM the decision of the ALJ. Accordingly, the Motion of Plaintiffs for Summary Judgment will be DENIED, that of Defendants will be GRANTED.

### II.

S.M. was born on March 18, 1991 and at the time of the due process hearing was 10 years of age. She was identified as having multiple learning disabilities, speech language deficits, and sensory integration issues.

S.M. attended kindergarten at Bradley Hills Elementary School (BHES) in the MCPS system during the 1996–97 school year, where she received no special education or related services. In the summer of 1997, however, at her parents' request, MCPS convened an Admission, Review and Dismissal (ARD) meeting, which the mother attended, to review S. M.'s needs and to propose a placement for the 1997–98 school. Noting S. M.'s continuing learning disability, the Committee developed an IEP for S.M. which, with the parents' approval, was implemented in a pre-academic program at Bannockburn Elementary School (BES), also in the MCPS system. S. M.'s 1997–98 IEP called for her time to be divided as follows: 25 hours per week in special education classroom instruction; one hour per week in speech/language diagnostic, and 17% in general education for art, music, physical education, lunch and recess. S.M. attended the pre-academic program at BES for the 1997–98 school year, her first-grade year.

On November 13, 1997, a 60–day review ARD meeting was convened, with both parents in attendance as well as S. M.'s special education teacher and speech pa-

---

**2.** This is the second time this case has reached this Court. The first time came on an appeal from the ALJ's decision of April 5, 1999 summarily dismissing the parents' claim on the basis of their alleged failure to comply with notice requirements under Maryland law. In an opinion dated July 25, 2000, the Court reversed the ALJ's decision, finding that the parents had given proper notice and remanding the case for further proceedings. *See Sarah M. v. Weast,* 111 F.Supp.2d 695 (D.Md.2000).

**3.** Summary judgment is appropriate where there is no genuine issue of material fact. Fed.R.Civ.P. 56. The parties apparently agree that such is the case here, the only issue being the conclusions to be drawn from undisputed facts. On the other hand, in an appeal from an administrative decision in an IDEA case, the Court is also the trier of fact. Accordingly, the Court can also (and indeed will) judge this appeal as the trier of fact, especially where—as here—the parties have added no evidence to the record beyond what the ALJ had before her. *Cf. Marathon Mfg. Co. v. Enerlite Prod. Corp.,* 767 F.2d 214 (5th Cir.1985) (holding that where the parties stipulate that the court may make findings of fact on the basis of the record at the summary judgment hearing, the court may determine the facts rather than merely whether factual issues exist).

thologist. S. M.'s goals and objectives and progress were discussed, and the parents expressed no disagreement that S.M.. was making progress.

On January 12 and 13, 1998, the parents commissioned independent educational and psychological testing of S.M. by Ruth Spodak, Ph.D. who met with the child for approximately 10 minutes and who, while not administering tests to her, collaborated on the preparation of a report of the test. On January 19, 1998, the parents also filled out an application for S.M. to attend the Lab School of Washington, D.C., beginning in the fall of 1998. The Lab School is acknowledged to have expertise in the education of children with learning disabilities.

On April 20, 1998, an annual ARD review meeting for S.M. was convened at BES, with both parents in attendance, as well as S. M.'s special education teacher, general education teacher, and speech pathologist. When the parents presented Dr. Spodak's report to the IEP team, it was agreed that the meeting should be adjourned to allow time for the team to review it. Prior to that meeting, however, Johna Enders, speech/language pathologist for MCPS, had sent a report to the

parents outlining S. M.'s progress toward the completion of her existing IEP goals and objectives and the proposed goals and objectives for the 1998–99 school year.

Also, at or about this time, the parents pre-enrolled S.M. at the Lab School, making a $1,000 non-refundable tuition deposit. On May 4, 1998, they proceeded to sign an enrollment contract with the Lab School, agreeing to make a further tuition payment of some $11,000 by June 16, 1998.

On May 20, the ARD review meeting was reconvened at BES again, with both parents in attendance, as well as S. M.'s special education teacher, general education counselor, school psychologist, resource teacher, and reading specialist. Dr. Spodak's report was taken up at the meeting, including her opinion that the child needed Intensity V attention.[4] Following discussion and review of the report, the ARD Committee expressed its disagreement with Dr. Spodak's opinion.

The IEP proposed for S.M. for 1998–99, developed at the ARD meeting on May 20, 1998, continued the goals and objectives set forth in her 1997–98 IEP. It called for S.M. to receive 19 hours of special education, classroom instruction at an Intensity IV level;[5] one hour per week

4. Under COMAR 13A.05.01.10(E), in effect at the time:

(6) Intensity V may be considered appropriate for the student who requires a more intensive special education program than Intensities I–IV. The maximum class size or caseload for Intensity V service for students with disabilities is an average of six students with disabilities with special educational needs per full-time certified special education teacher or an average of nine if a full-time aide is provided. The maximum class size or caseload for Intensity V service for students with significant physical impairments is an average of seven students with disabilities per full-time certified special education teacher and a full-time aide.

5. Under COMAR 13A.05.01.10(E), in effect at the time:

(5) Intensity IV may be considered appropriate for the student who may be appropriately served by receiving special educational services for more than 3 hours per day. Services include special education provided by a special education teacher, and related services as described in the individualized education program. The maximum class size or caseload for Intensity IV service at the elementary level is an average of 10 students with disabilities with special educational needs per full-time teacher or an average of 13 students if a full-time aide is also provided. The maximum class size or caseload for Intensity IV service at the secondary level is an average of 12 students with special educational needs per full-time certified special education teacher or an average of 15 students, if a full-time aide is provided.

speech/language-related services, occupational therapy (OT) review and 33% in general education mainstreaming in math, lunch and recess. The placement would be at BHES. According to the ALJ, the IEP was silent as to S. M.'s math goals inasmuch as the child's math performance and grades did not indicate a particular need in that area. In fact, the ALJ found that S.M. had moved into regular education in math.

The parents declined to sign the IEP at the May 20 ARD meeting, indicating that they wanted an opportunity to discuss it with Dr. Spodak. According to the ALJ, the parents promised at that point that they would get back to MCPS. At the same time, the parents requested and MCPS agreed to conduct OT testing of S. M., to be completed by the fall of 1998.

On May 27, the parents sent a letter to Jane Butler, the principal at BES, stating their concerns following the May 20 meeting. In the letter, they mentioned S. M.'s problem with reading skills, referring to Dr. Spodak's opinion that S.M. had "significant processing issues in both the verbal and visual domain," and expressing concern over S. M.'s limited access to special attention in class as well as her lack of social growth over the years. They made no reference, however, to a lack of stated goals or needs in the IEP, nor did they find fault with any lack of reference to current performance levels.

On May 28, Butler sent a letter to the parents that crossed in the mail with their letter to her of May 27.[6] In it, Butler explained how S. M.'s IEP had been developed and gave notice to the parents that the IEP would become effective within 30 school days after the letter's date.

More or less simultaneously, by cover letter dated May 29, the parents forwarded the proposed IEP to Dr. Spodak for her comments. Their letter noted that S.M. was to be "evaluated by (the) Lab School in late June for speech and OT."

On June 4, Dr. Spodak faxed back her suggestions for S. M.'s IEP to the parents. The parents did not transmit Dr. Spodak's suggestions to MCPS.

On June 18, S. M.'s mother completed a development history of S.M. for the Lab School's Occupational Therapy Department and on June 19 and 23 the Department conducted an assessment of S. M.

Not having received a response from Butler to their letter of May 27, the parents sent her a letter on July 8 rejecting the IEP proposal and advising that S.M. would be enrolled in private school beginning in September 1998. The letter referred once again to Dr. Spodak's opinion that S.M. had "significant issues in both the verbal and visual domain" and stated that S.M. needed to be "taught strategies compensating for her deficiencies, along with the basic skills in language arts and math." Still, however, the letter failed to mention Dr. Spodak's suggestions for the IEP that had been faxed to the parents on June 4, and still it failed to disclose the fact that in the interim S.M. had undergone OT testing at the Lab School and was also about to undergo speech and language assessment there.[7]

On July 19, the parents wrote to Butler, advising that they had only just received

---

**6.** Apparently Butler's letter did not arrive at the parents' residence until more than two weeks later, having been returned for insufficient postage.

**7.** It is not clear from the record whether S. M.'s speech/language assessment at the Lab

School took place before or after July 8. The report of the assessment was clearly dated after July 8, *i.e.* on July 14. What is relevant, however, is that before July 8 the parents knew that the assessment was going to be made and did not communicate that fact to MCPS.

her letter of May 28, and stating that they looked forward to receiving a response to their July 8 letter. Again, however, the parents failed to communicate Dr. Spodak's suggestions for the IEP or to disclose the fact of the OT or speech and language assessments.

On August 6 the parents finally disclosed to Butler (and MCPS) the existence of the OT assessment that had been prepared by the Lab School. Although they had been advised by the Lab School as far back as late May that OT testing was "indicated" for S. M., the parents told Butler in their letter that:

> Since we heard nothing regarding an [OT] evaluation by the County, and we wanted to ensure an appropriate program for [S.M.] for the coming September, we decided to go ahead with a private evaluation.

On September 16, after S.M. had begun her new classes at the Lab School, the parents finally disclosed the existence of and forwarded to Butler a copy of the speech and language assessment that had been prepared on or about July 14.[8]

The ALJ found that the parents had "demonstrated their lack of good faith by withholding from MCPS until after they notified the MCPS that their child would be attending private school for 1998–99, their case manager's IEP recommendations, the OT report, and the speech/language reassessment. They clearly never intended to accept a public school place-

ment for the 1998–99 school year and it would be inequitable to award them reimbursement."

Apart from that, the ALJ concluded that S.M. had "received a FAPE during the 1997–98 school year at BES and that the MCPS's 1998–99 IEP with placement at BHES was reasonably calculated to provide [her] with a FAPE." Consequently reimbursement for S. M.'s private schooling was denied. The parents appeal from these findings and conclusions.[9]

### III.

The Court considers first whether S.M. was offered a FAPE for 1998–99. The parents say "no," arguing that S. M.'s proposed IEP was deficient both procedurally and substantively.

As for the alleged procedural deficiencies, they argue first that the proposed IEP lacked goals and objectives for OT, phonemic awareness, organization and spelling, and math. They suggest that the proposed IEP would not have been useful if it had been referred to the Lab School by the school system; instead the Lab School would have had to develop an IEP on its own.

The second alleged procedural deficiency was that the IEP lacked current levels of performance for math, organization and phonology. As a result, there was no basis for understanding and assessing S. M.'s progress.

**8.** The parents never voluntarily transmitted to MCPS the suggestions Dr. Spodak made relative to the IEP. According to MCPS, those suggestions were disclosed for the first time at the due process hearing, after Dr. Spodak was subpoenaed to produce them.

**9.** At one time at least, the parents suggested that they never received copies of the Procedural Safeguards–Parental Rights pamphlet mentioned in letters from the school authorities. To the extent the parents are still claim-

ing that they failed to receive appropriate notice regarding their appeal rights, it is clear that the ALJ had an evidentiary basis for finding that they in fact did receive such notice in advance of May 20, including at least one document that S. M.'s mother initialed acknowledging receipt of the pamphlet. The Court notes, moreover, that both of S. M.'s parents are attorneys who were represented at all relevant times by counsel who specializes in IDEA cases and that in fact they pursued their appeal rights in timely fashion.

The parents also contend that the IEP was deficient from a substantive standpoint.

One of the first areas of identified need not addressed by the IEP, they say, was occupational therapy (OT). OT helps people function in the tasks they need to perform on a daily basis. Among other things, an occupational therapist can work on fine motor skills and positioning. The parents argue that the IEP failed to address any areas of OT, hence it proposed no OT as part of S. M.'s program for the school year. Nor, they add, did MCPS ever conduct an OT assessment of S. M.

The second alleged substantive deficiency of the IEP was its alleged lack of critical and necessary goals for phonemic awareness and current levels of performance for phonology. Phonemic or phonological awareness is the underlying ability to discriminate and order sounds. According to Donna Pavluk, the Lab School's speech/language pathologist, phonemic awareness is "an absolute requirement to be able to read and spell." Johna Enders, MCPS's speech/language pathologist, testified that phonemic awareness is the "foundational step" to phonics, that is, the application of sound symbols to sound. The parents complain that MCPS never conducted a phonemic awareness assessment of S.M. and as a result did not know what goals or objectives should be in the IEP.

Finally, the parents contend that the IEP was substantively deficient in the area of math, *i.e.* it contained no math goals to address S. M.'s identified needs.

### IV.

■ A) On an appeal from an administrative decision in an IDEA case, the district court is required to make an independent decision based on a preponderance of the evidence, but must give due weight to the state administrative findings, accepting such findings prima facie correct. *See Sch. Comm. v. Dep't. of Educ.,* 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Kirkpatrick v. Lenoir County Bd. of Educ.,* 216 F.3d 380, 385 (4th Cir.2000); *Doyle v. Arlington County Sch. Bd.,* 953 F.2d 100, 105 (4th Cir.1991). The court considers whether the school authorities committed procedural or substantive violations of the IDEA that would entitle the parents to reimbursement. To support a finding that a child has not been provided with a FAPE, the procedural violations must be sufficiently serious as to cause the child to lose educational opportunity. *See Burke County Bd. of Educ. v. Denton,* 895 F.2d 973, 982 (4th Cir.1990). As this Court noted in *Sanger v. Montgomery County Bd. of Educ.,* 916 F.Supp. 518, 526–27 (D.Md.1996) (citations omitted): "First, the key consideration in any procedural analysis under IDEA is whether full and fair parental involvement in the review process has been afforded. Second, to the extent they there may be a failure to comply strictly with IDEA's procedures, the Court must consider whether the failures have caused the loss of 'educational opportunity' or are merely technical in nature."

■ The burden of proof when they challenge the presumed correctness of the ALJ's findings is upon the parents. *See Barnett v. Fairfax County Sch. Bd.,* 927 F.2d 146, 152 (4th Cir.1991); *Tice v. Botetourt County Sch. Bd.,* 908 F.2d 1200, 1206 n. 5 (4th Cir.1990); *Spielberg v. Henrico County Pub. Sch.,* 853 F.2d 256, 258 n. 2 (4th Cir.1988).

B) It is true that an IEP is:

A written description of the special education needs of the student and the special education and related services to be provided to meet these needs. The goals, objectives, activities and materials

shall be adapted to the needs, interests, and abilities of each student.

COMAR 13A.05.01.09A.

It is also true that the IEP should include:

"(i) a statement of the child's present levels of educational performance, including (I) how the child's disability affects the child's involvement and progress in the general curriculum; . . .

(ii) A statement of measurable annual goals, including benchmarks or short-term objectives[.]"

20 U.S.C. § 1414(d)(1)(A); *see also,* 34 C.F.R. §§ 300.340(a) and 300.347(a)(1)(i).

■ The issue, however, is whether the omission from the IEP of certain specific stated needs and goals or present performance levels is fatal to the document, such that parents are automatically entitled to reimbursement for a subsequent private school placement. The Court finds that it is not.

In *Doe v. Defendant,* 898 F.2d 1186, 1190 (6th Cir.1990), plaintiffs contended that they were denied a FAPE because the IEP developed for the child by the school system contained "no reference to his present educational performance," nor did it include "objective criteria and evaluation procedures and schedules for determining, at least on an annual basis, whether instructional objectives [were] being achieved." While this information was not specifically written into the IEP, the court held that:

to say that these technical deviations from section 1401(19) render appellant's IEP invalid *is to exalt form over substance.* It is undisputed that appellant's most recent grades were known by both the parents and the school officials. Moreover, because he was to be given instruction in the regular classroom, he would be graded according to the normal criteria used in the class. Only his method of instruction would be different.

*Thus, the parents and administrators had all of the information required by section 1401(19), even though it was not contained within the four corners of the IEP.*

*Id.* at 1190. (emphasis supplied)

The Court in *Doe* recognized the importance of the IDEA's procedural safeguards as discussed in *Bd. of Educ. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690(1982). "Recognizing," said the *Doe* court, "that *Rowley* holds that the adequacy of an IEP is to be judged by whether it was produced in conformity with the requirements of section 1401(19), the [Supreme] Court's continued emphasis on the *procedural* safeguards afforded to parents convinces us that the Court was referring to the process by which the IEP is produced, rather than the myriad of technical items that must be included in the written document . . . Adequate parental involvement and participation in formulating an IEP, not adherence to the laundry list of items given in section 1401(19), appear to be the Court's primary concern in requiring that procedures be strictly followed." *Id.* at 1190–1191 (emphasis in original). The court concluded by holding that "because appellant's parents were allowed to participate fully in the development of his November 7, 1986 IEP, the procedural requirements of the [IDEA] were met even though two items were omitted from the document." *Id.* at 1191.

There is no question that the parents in the present case had adequate involvement and participation in formulating the IEP. On the other hand, while they may well have disagreed with what was proposed for S. M., it is indisputable that at the May 20, 1998 ARD meeting they raised no objections to the goals and objectives or as to S. M.'s present levels of performance, indicating only that they wished to discuss the proposal with Dr. Spodak and get back to

the school authorities. Their letter of May 28 to BES Principal Butler was vague at best, essentially repeating Dr. Spodak's general observation that S.M. had "significant processing issues."

While they received written suggestions from Dr. Spodak relative to the IEP within some two weeks following the May 20 meeting, they never communicated those suggestions to MCPS. According to Amy Tartikoff, S. M.'s special education teacher at BES for 1997–98, had Dr. Spodak's suggestions been presented to the IEP team, some might have been incorporated into the IEP. In any case, with regard to the math and phonemic awareness goals, those would have been part of S. M.'s second grade curriculum and it was therefore unnecessary to write them into the IEP. Further, S. M.'s most recent grades were well-known to both the parents and school officials. As the ALJ found, S. M.'s grades at BES for the first grade during the 1997–98 school year had increased steadily, as shown by her student progress report. She received a passing grade in all subjects, with outstanding grades in word recognition, spelling, and the computational aspects of mathematics. The ALJ specifically found that the IEP developed for S.M. for the 1998–99 school year continued the goals and objectives set forth in the 1997–98 IEP. Moreover she found that the 1998–99 IEP was appropriately silent as to mathematics goals, since S. M.'s math performance and grades had moved her into regular education in math and indicated no particular needs in that area. And, again, the ALJ found that the parents had not gotten back in timely fashion to the IEP team with regard to the IEP after May 20, 1998, to modify the proposed goals and conditions or to dispute the lack of current performance components in the plan.

The Court agrees with and adopts these findings of fact. To the extent, therefore, that the parents claim that there were procedural deficiencies with regard to the IEP, the Court emphatically rejects that claim.

If there were any doubt, it may also be said that none of the alleged deficiencies regarding the criteria and evaluation procedures for measuring goals in any way denied S.M. an educational opportunity.

An analogous situation arose in *Bd of Educ. v. Brett Y.*, 28 IDELR 460, 1998 WL 390553 (4th Cir.1998). There:

> the ALJ concluded that deficiencies in the IEP caused Brett to lose educational opportunity. Specifically, the ALJ found that the school system's failure to include appropriate objective criteria and evaluation procedures for measuring goals, internal inconsistencies in the IEP, and *failure to update the IEP to reflect the extent of Brett's disability and most recent educational performance* were procedurally deficient under the IDEA. Even assuming that these deficiencies in the IEP existed, we agree with the district court that *none of the alleged deficiencies relied upon by the ALJ constituted a denial of FAPE.*

*Id.* at 465–466, 1998 WL 390553 (emphasis supplied).

The Fourth Circuit observed that the "district court concluded that 'any minor deficiencies in the IEP in terms of describing Brett or setting objective criteria for goals could have been corrected.' ... Furthermore, the district court relied upon the Yaders' failure to challenge any of the alleged deficiencies at the August 30, 1996 CARD, Committee meeting when it concluded that the school system did not deny Brett a FAPE." *Id.* at 466, 1998 WL 390553. The Court finds *Brett Y.* to be an accurate description of the nature and effect of any procedural deficiencies in the present case.

S. M.'s parents fare no better with regard to their claims that the proposed IEP was substantively deficient.

Certainly their claim with respect to the failure of the IEP to address OT is puzzling. At the conclusion of the May 20, 1998 ARD meeting, S. M.'s mother for the first time requested an OT evaluation and MCPS agreed to perform it. Then, within days of that meeting, the parents were advised by the Lab School that an OT evaluation was indicated for S.M. and on June 19 and June 23 they went forward with that evaluation. In short, they had an evaluation in hand just one month from the May 20 meeting. It is difficult to see how MCPS can be faulted for not having conducted a test when the parents already had one in hand and failed to disclose it until one month after they told MCPS they were withdrawing S.M. from public school.[10]

The parents also claim that the IEP failed to propose appropriate speech/language services for S. M.. But in fact the IEP recommended one hour of speech/language services for her and the parents never objected to that proposal. Moreover, as MCPS points out, the case largely resolved itself into a weighing of the credibility of the parties' respective speech/pathologist witnesses. The speech pathologist for MCPS had worked with S.M. throughout the 1997–98 school year and testified that the IEP goals and objectives set forth for S.M. for 1998–99 were appropriate. The parents' speech/pathologist witness, on the other hand, who testified that S. M.'s speech language needs were more substantial, had neither met with nor

provided services to her. The ALJ, after reviewing all the evidence, concluded that the testimony, observations and assessments of S.M. by MCPS's educational professionals should be accorded more weight than that of the Lab School witnesses. The Court finds this was and is a reasonable conclusion.[11]

Finally, the parents argue that the IEP failed to propose an appropriate math program for S. M.. This argument is premised primarily on the alleged "repeated observations" of S. M.'s math teacher that she was "below grade level in math."

But in fact the ALJ found that S.M. was essentially performing on grade level. The child's first grade teacher, Amy Tartikoff, testified to this effect at several points, conceding that, while S.M. might have been at the lower end of the grade level range, she was nonetheless still on grade level. Indeed S. M.'s grades for 1997–98 at BES were overall "satisfactory" for mathematics, specifically satisfactory for "concepts" and "application," and "outstanding" for computation. Lanee Howell, S. M.'s mathematics teacher, rated her as somewhere between on grade and below grade level. S. M., she felt, could appropriately have been mainstreamed in math for second grade during the 1998–99 school year, with "support and help," which was what she was getting at BES during the first grade. Howell felt that S.M. would have continued to make meaningful progress through the implementation of her special education program in a similar pre-academic class at BHES. She pointed out that by "support and help" she meant that, in her "experiences with mainstreaming,

---

**10.** Teri Bell–Yehiel, OT expert for MCPS, testified that any OT test conducted after the Lab School's test would not only have been unnecessary, but would have been of doubtful validity by reason of the "practice effect" of the Lab School test.

**11.** To the extent that it is at all relevant, the Court notes that the July 14, 1998 speech and language evaluation performed by the Lab School recommended one individual and one small group therapy session per week for S. M., arguably an insignificant difference from what MCPS proposed.

they always come with some additional support, with the exception of a couple." And indeed, when specifically asked why she didn't suggest that there be any IEP goals for math, she responded "I guess I thought it wasn't significant enough to warrant that."

Here, too, the ALJ found it significant that the issue of math goals for S.M. was never raised by the parents at the May 20, 1998 IEP meeting.

Given this evidentiary background, the ALJ was justified in finding that the silence of the IEP as to a math program was not inappropriate.

## V.

■ Ordinarily, with the finding that a child was offered a FAPE for a disputed year, the issue of reimbursement *vel non* would be moot. If a FAPE was offered, parents who have pursued a private placement lack any entitlement to reimbursement. There is an aspect of this case, however—the parents' alleged failure to cooperate in the development of the IEP— that merits comment. For if indeed there was such a lack of cooperation, it would also be possible to conclude that reimbursement should be denied, without reaching the issue of whether the child was offered a FAPE. That was certainly the import of this Court's holding in *Sanger v. Montgomery County Bd. of Educ.*, 916 F.Supp. 518, where the Court found that the parents and their counsel had "blocked every effort by MCPS to develop a new [IEP]." *Id.* at 527. There the blockage consisted, *inter alia*, of cancellation of multiple ARD meetings by the parents, their direct filing for a due process hearing before giving MCPS notice and an opportunity to deal with their objections, their refusal to respond to the ARD Committee's proposal for a residential placement for the child in a County facility, and their failure to visit the facility. The Court

accordingly found that the parents' claim that MCPS never developed an IEP for the child was "totally groundless." *Id.*

While the facts in the present case may not be as aggravated as in *Sanger*, at a minimum they do bespeak a considerably less than whole-hearted effort on the part of the parents to cooperate in the joint enterprise that the IEP is supposed to be. They withheld critical documents from the ARD Committee—Dr. Spodak's suggestions (not supplied until the due process hearing and then only by subpoena) and the OT and speech/language reassessments (not disclosed or supplied until well after the decision had been made to remove S.M. from public school). In the interim, the parents never followed up with specific suggestions for S. M.'s proposed IEP, even though they had Dr. Spodak's suggestions in hand within approximately two weeks of the May 20, 1998 meeting.

As the Court has observed before, parents are not to be faulted simply because they may have been of a firm mind to send their child to private school, while engaged in developing an IEP for the child. *See Sarah M. v. Weast*, 111 F.Supp.2d at 701, n. 6. Citizens and taxpayers are entitled to a FAPE for their children and, if the public school authorities cannot provide it, the parents are entitled to reimbursement. But the parents act at their own risk and, if it eventuates that an ALJ or a court finds that a FAPE was in fact offered, they will receive nothing. But before they can fairly argue that the best the school authorities had to offer was or is not good enough, the critical pre-requisite is that the parents must have cooperated with the school authorities in good faith to try to develop the IEP. Good faith cooperation includes reasonable and timely cooperation with the school authorities.

That is what was missing in the present case. The parents are not to be faulted for making arrangements for S.M. to attend private school even as they met with MCPS over the IEP. But they also held back critical data they had in hand, some of which might well have been incorporated in the IEP. For this additional reason, as the ALJ found and the Court now also finds, reimbursement of the parents for S. M.'s private schooling should be denied.

## VI.

Finally, a word should be said about the proposed placement for S.M. for the 1998–99 school year at the Intensity IV program at BHES. The ALJ agreed that the program proposed for S.M. at BHES was a continuation of the program in which she had been successful at BES during the 1997–98 school year. The parents take issue with S. M.'s alleged "progress" at BES, arguing that ALJ's findings on this issue were contrary to the overwhelming weight of the evidence. Again, however, Amy Tartikoff, S. M.'s special education teacher in first grade, testified to S. M.'s progress at BES, and stated her opinion that the BHES placement was appropriate and that S.M. would continue to make progress in that placement. This opinion was echoed by Cynthia Mulholland, the special education resource teacher S.M. would have had had she attended BHES. Mulholland testified that the goals and objectives expressed in S. M.'s IEP were the type of goals and objectives that she worked on routinely with her students such that, in her view, BHES would have "worked just fine for [S. M.]."

On the basis of this testimony, the ALJ reasonably concluded that the BHES placement proposed for S.M. would have been consistent with S. M.'s educational needs. *See* 20 U.S.C. § 1412(5). The child was not entitled to a maximally beneficial education, only an appropriate one. The Court agrees that the ALJ's conclu-sions that S.M. would have received a FAPE in this case.

## VII.

For these reasons, the Court will DENY Plaintiffs' Motion for Summary Judgment and will GRANT Defendants' Cross–Motion for Summary Judgment. Except as otherwise stated here, the Court, in its capacity as the trier of fact, adopts the findings and conclusions of the ALJ.

A separate Order will be ENTERED.