**CONVERSE COUNTY SCHOOL DISTRICT NO. TWO, Petitioner,**

v.

**Barbara PRATT, C.D. and E.F., Respondents.**

**A.B., Intervenor Respondent.**

**No. 97–CV–175–AJ.**

United States District Court, D. Wyoming.

Dec. 18, 1997.

Ann M. Rochelle, Williams, Porter, Day & Neville, Casper, WY, for Converse County School District No. 2.

Barbara Pratt, Glenrock, WY, pro se.

Daniel E. White, Gusea, Pattno & White, Cheyenne, WY, for A.B.

## ORDER DENYING PETITIONER'S MOTION TO REMAND; DENYING PETITIONER'S MOTION FOR SUMMARY JUDGMENT AND GRANTING INTERVENOR A.B.'S MOTION FOR SUMMARY JUDGMENT

ALAN B. JOHNSON, Chief Judge.

This matter came before the court for hearing on December 12, 1997. The court has considered the entire file and is fully advised.

### I.

This declaratory judgment action involves a turf battle between the Converse County School District No. 2 on the one hand and on the other hand the proposed surrogate parent (Ms. Pratt) of a 6–year–old developmentally disabled child; the child himself (Intervenor A.B.); and the child's foster parents, C.D. and E.F. In addition to being his foster parents, C.D. and E.F. are also A.B.'s great-aunt and great-uncle.

The School District filed this action in state court seeking a declaration that it has authority to appoint a "surrogate parent" for A.B. for the purpose of representing him during the process known as the Individualized Education Plan (IEP). The School District seeks declaratory relief that it, and not non-party State of Connecticut, is entitled to appoint the surrogate parent. The School District also seeks a declaration that a May 13, 1997, Connecticut Juvenile Court Order appointing respondent Barbara Pratt as A.B.'s agent in Wyoming be declared of no effect.

A.B. (through his lawyer) intervened in the state court action and removed the case to this court asserting federal question jurisdiction. The foster parents were added as respondents by Amended Complaint. A.B. contends that the questions of who is qualified to serve and who has authority to appoint a surrogate parent for the IEP process is a matter of federal law under the Individuals with Disabilities Education Act, (IDEA), 20 U.S.C. §§ 1400 et seq., and the related regulations.

A major player in this battle is non-party Connecticut Department of Children and Families (DCF). The DCF has custody of the child, and is paying the entire bill for his foster care, his medical bills and his educational expenses.

### II.

Three Motions are the subject of this Order. One, is the School District's Motion to Remand this case to state court on the basis there is no federal question jurisdiction. Two, the School District seeks summary judgment that under the Wyoming Rules and Regulations Governing Services for Children with Disabilities only it has the authority to appoint a surrogate parent and that it acted appropriately in appointing a surrogate parent.

Three, A.B.'s Motion for Summary Judgment declaring that his foster parents are "acting as a parent" for him and therefore no surrogate is necessary. Alternatively, he seeks to have his foster parents appointed as surrogate parents.

### III. UNDISPUTED FACTS

A.B. was born February 2, 1991, and he had no father listed on his birth certificate. His mother, G.H. was exposed to natural gas and was comatose when rushed to the hospital in Lincoln, Nebraska for his birth. At the hospital it was discovered that A.B. suffered from seizures in utero. He continues to have a seizure disorder to this day. He also has short stature and developmental delay, particularly in communication skills.

After his birth, A.B.'s mother started a relationship with a man not A.B.'s father, had a second child and the family moved to Connecticut. When A.B.'s mother and stepfather[1] separated, A.B. was left in the care of his stepfather and the stepfather's new girlfriend. The State of Connecticut found the

---

1. Although this individual is referred to as A.B.'s stepfather, the record does not reveal whether he and A.B.'s mother were ever formally married. See Pet.'s Ex. 1 p. 1.

stepfather and his girlfriend to be unfit to care for A.B.

On November 9, 1995, the Juvenile Court of Montville County, Connecticut adjudicated A.B. a neglected child and he was committed to the custody of the Connecticut DCF. His caseworker is Nicole Christie. Ms. Christie took A.B. for his initial medical evaluations in Connecticut and continues as his social worker today.

While in Connecticut, A.B. was evaluated and an IEP was developed and implemented. In the meantime, A.B.'s mother's uncle and his wife, the foster parents, agreed to take A.B. into their home in Glenrock, Wyoming under what the DCF characterizes as a "family placement." On July 26, 1996, the Connecticut DCF and the foster parents entered into two agreements specifying their respective responsibilities. C.D. and E.F., as foster parents, receive a monthly stipend for the child's support. The Connecticut DCF separately pays all medical and educational expenses. Under the Agreements, A.B.'s mother has the right to visit him in the foster parent's home but is not allowed to take him out of the house.

Although the pre-printed boiler plate language of one of the Agreements says that it is not a placement for adoption or long-term foster care, the foster parents and the Connecticut DCF intended that A.B.'s placement with the foster parents be permanent. The DCF's Individual Treatment Plan prepared for A.B. in November 1996, provides the goal for him is that, after an appropriate monitoring process, permanent guardianship of A.B. be transferred to his foster parents.

The foster parents already consider A.B. to be part of their family. They plan to adopt him when the Connecticut DCF arranges a termination of parental rights. The foster parents have never had another foster child. They accepted A.B. as a foster child because it was their understanding that it was the quickest method for him to be placed in their home. E.F.'s Aff'd ¶¶ 2–6.

The foster parents enrolled A.B. in grade school in Glenrock, in the Fall of 1996. By letter dated August 23, 1996, the Connecticut DCF agreed to pay all of A.B.'s expenses but reminded the School District of its obligation to create an IEP. Ms. Christie, on behalf of the Connecticut DCF, signed the permission necessary for the IEP process.

While a new IEP was being formulated, the one developed in Connecticut was to be followed. The parties' initial falling out appears to have occurred because the Connecticut IEP calls for a full day of kindergarten and Glenrock has only half-day kindergarten classes.

On October 30, 1996, Mr. Jerry Howard, the School District's Special Education Director wrote Ms. Christie asking for additional releases and stating that the District had appointed Jeanette Merritt as A.B.'s surrogate parent for the IEP process. His letter states:

> We plan to use Jeanette to sign off on IEP and educational matters. If this does not meet with your approval, please let us know.

Pet.'s Ex. 3.

Ms. Merritt was employed as a counselor in neighboring Douglas, Wyoming schools at the time of her appointment. The School District describes her position as Mr. Howard's counterpart in the neighboring district. The two school districts are entirely separate.

As discussed below, the parties now have a sharp dispute over what was the basis for the School District to appoint a surrogate parent. Mr. Howard's letter does not specify a basis other than it is to "better serve [A.B.'s] educational needs." *Id.*

By November, the Connecticut DCF noted in A.B.'s Individual Treatment Plan that it was necessary for it to intervene with the School District on behalf of the foster parents in their attempt to obtain necessary educational support for A.B.

On February 18, 1997, Ms. Christie wrote to Mr. Howard and noted that E.F., the foster mother, was frustrated by her inability to contact Ms. Merritt. Ms. Christie noted that E.F. had received help and support from Ms. Pratt and asked that the School District remove Ms. Merritt as surrogate parent and replace her with Ms. Pratt. Ms. Christie

also asked about evaluations of A.B., which were several months overdue.

On March 3, 1997, Ms. Christie wrote Mr. Howard that the Connecticut DCF would agree to his request to revoke its request to change A.B.'s surrogate parent only on three conditions: (1) Ms. Merritt make monthly face-to-face contact with A.B. and his foster parents; (2) Ms. Merritt contact the DCF on a regular basis about her efforts on A.B.'s behalf; and, (3) Ms. Pratt be allowed to accompany A.B.'s foster mother to the IEP meetings and other meeting pertaining to A.B.'s education.

On April 25 and 28, 1997, the foster parents wrote the School District suggesting themselves or other named individuals be appointed as A.B.'s surrogate parents.

On April 28, 1997, the attorney and consultant for Protection and Advocacy Systems, Inc. intervened on A.B.'s behalf with a very strongly worded letter to Mr. Howard outlining what it alleged were the School District's and Ms. Merritt's failures in regard to A.B.'s educational needs. The tenor of the letter is illustrated by the allegations that Ms. Merritt as the employee of a neighboring school district and colleague of Mr. Howard has a conflict of interest and "has completely abandoned the rights and interests of the child." Intervenor's Ex. H. p. 2. This letter asserted that the foster parents could serve as surrogate parents.

Protection and Advocacy's letter also outlined the School District's failure to meet any of the specific deadlines set out in the Wyoming Rules and Regulations for various actions in connection with the IEP process. For example, the Rules and Regulations require that an IEP be developed no more than 60 work days after parental consent is given. Ms. Christie signed the consent form for an evaluation on September 26, 1996, yet no attempt to even schedule a meeting was made until March 10, 1997. The first meeting did not take place until April 21, 1997.

Protection and Advocacy's letter also stated its position that the Wyoming Rules and Regulations were inconsistent with federal case law interpreting the IDEA.

On April 30, 1997, Mr. Howard wrote to the Connecticut DCF and said he would consider revoking the appointment of Ms. Merritt. He also said that while he had no objection to the foster parents acting as surrogate parents, he believed that the Wyoming Rules and Regulations prohibited foster parents from acting as surrogate parents. Instead he suggested appointing either one of two individuals who had answered his advertisement recruiting surrogate parents. One of these individuals is G.H., herself the mother of a special education student.

On May 8, 1997, Ms. Christie wrote Mr. Howard that DCF was requesting the Ms. Merritt be removed and that G.H. be appointed. Mr. Howard appointed G.H. as A.B.'s surrogate parent the same day.

On May 11, 1997, A.B.'s IEP meeting was held. G.H. attended but as she had been aware of her appointment for less than 48 hours previously and had never heard A.B. speak, she declined to comment on at least one matter.

On May 13, 1997, A.B.'s Connecticut Guardian ad Litem presented the Montville County Juvenile Court with an Ex Parte Motion to Revoke Consent and To Appoint Agent stating that the DCF was in full agreement. On the same day the Ex Parte Order was granted and the Juvenile Court ordered as follows:

> [T]he consent for Converse County School to appoint a surrogate parent is revoked and Barbara Pratt is *appointed as the agent* for [A.B.] in the State of Wyoming for any and all educational purposes including, but not limited to, independent educational plans.

Pet.'s Ex. 8 p. 4 (underlined emphasis added).

On June 5, 1997, the School District filed this declaratory judgment action in the Eighth Judicial District Court, County of Converse, State of Wyoming. Also on June 5, 1997, the School District sent a certified letter to A.B.'s parents in care of the Connecticut DCF with the following letter:

> Please send or fax Converse County School District # 2 the last known address of the parent or parents of [A.B.] as we are

trying to communicate with them regarding [A.B.'s] educational program. Our fax number is ... Additionally, I am requesting that you forward this request to [A.B.'s] parents at the last known address that you have in your records. Also, could you inform me as to the current status of the parental rights of the parents of [A.B.].

Pet.'s Ex. 10.

This letter to DCF was the School District's only attempt to contact A.B.'s parents. The School District did not attempt to contact A.B.'s parents by communicating with the foster parents. The foster parents knew the whereabouts of A.B.'s mother and the status of her parental rights. E.F.'s Aff'd ¶ 6.

On July 29, 1997, the Wyoming Attorney General's Office responded by Memorandum to the following question submitted by the Superintendent of Public Instruction: "May a foster parent, under the provisions of 34 CFR § 300.514 serve as a surrogate parent?" The question was answered: "A foster parent who meets the requirement of 34 CFR § 300.514 may serve in Wyoming as a surrogate parent."

The Memorandum opined that foster parents in Wyoming are not parents as set forth by 34 CFR § 300.13 and also opined that Section 41(a)(i) of the Wyoming Rules and Regulations may be in conflict with federal law. The Memorandum advised that "an appointment of surrogate parents in Wyoming should be made as set forth in federal regulations." It also advised:

If the foster parents meet the requirements of 34 CFR § 300.514, the school district may select them to act as surrogate parents. However, federal regulations do not require the school district to do so. A school district is not free to merely select anyone. The district must appoint a surrogate parent for [A.B.] who meets the requirements of the federal regulations and who will advocate for [A.B.] based on his individual needs and characteristics.

On September 24, 1997, the School District filed its Amended Complaint adding the foster parents as respondents in this case.

A.B.'s Occupational Therapy Evaluation, conducted on April 3, 1997, reveals that while he is an affectionate and eager-to-please child, he is a child with many physical problems that directly impact his ability to learn. According to the report he will require physical therapy and special intervention in the classroom.

The School District has now completed A.B.'s IEP.

## IV. DISCUSSION AND CONCLUSIONS

### A. MOTION TO REMAND

The first issue before the court is whether there is a federal question involved. Intervenor contends there is a federal question involved because the definition of a "person acting as a parent of the child" contained in the Wyoming Rules and Regulations conflicts with 34 CFR § 300.13. Intervenor contends that under the federal regulations his foster parents can act as his surrogate parents and to the extent that the Wyoming regulation prohibits them from doing so, it is preempted by federal law including the federal regulations implementing that federal law.

The School District contends that because its complaint sought only an interpretation of various provisions of the Wyoming Rules and Regulations there is no federal question. The School District specifically denies that there is any conflict between the Wyoming Rules and Regulations and the federal Law and regulations.

The federal question jurisdictional statute, 28 U.S.C. § 1331, reads: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

Section 1441(b) of Title 28 of the United States Code provides

Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to citizenship or residence of the parties.

28 U.S.C. § 1441(b).

Subsection (c) of 28 U.S.C. § 1441 requires remand, prior to final judgment, of

any case which was improperly removed to the federal court.

 In determining whether an action arises under federal law within the meaning of Title 28, courts follow the well-pleaded complaint rule.

That rule mandates that whether an action arises under federal law " 'must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance or defense which it is thought the defendant may interpose.' " *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (quoting *Taylor v. Anderson,* 234 U.S. 74, 75–76, 34 S.Ct. 724, 58 L.Ed. 1218 (1914)).

The "well-pleaded complaint" rule may not be misused by litigants, however, "to defeat removal by omitting to plead necessary federal questions in a complaint." *Franchise Tax Board,* 463 U.S. at 22. This exception to the "well-pleaded complaint" rule is known as the "artful pleading" doctrine. Under that doctrine, *a state law claim may be recharacterized as a federal claim if two conditions are met: (1) the state law claim must be preempted by federal law, and (2) federal law must provide the plaintiff with a cause of action to remedy the asserted wrong.* *Hunter v. United Van Lines,* 746 F.2d 635 (9th Cir. 1984), *cert. denied* 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985).

*Amelia County School Board v. Virginia Board of Education,* 661 F.Supp. 889, 892 (E.D.Va.1987) (underlined emphasis added).

Thus, "a plaintiff may not escape federal jurisdiction by 'artful pleading.' " *Fayetteville Perry Local School District v. Reckers,* 892 F.Supp. 193, 197 (S.D.Ohio 1995).

 Because the artful pleading exception provides that a state law claim may be characterized as a federal claim if the state law claim must be preempted by state law, *Amelia County Sch. Bd. supra,* this court needs to examine the intervenors' contention that federal law preempts the state law claim brought by the School District.

It is well-established that under the Supremacy Clause of the United States Constitution, state laws that "interfere with, or are contrary to" federal law are invalid. U.S. Const. art. VI, cl. 2. Preemption can take one of three forms: (1) express preemption, where Congress passes a statute that by its express terms preempts state law; (2) implied preemption, where federal legislation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulations, and (3) actual preemption, where Congress speaks neither expressly nor impliedly of preemption, but state law is nonetheless preempted to the extent that it actually conflicts with a federal statute or rule. This court finds that [Indiana's procedure for implementation of IEPs] is actually preempted by Congress. Actual conflict arises when " 'compliance with both federal and state regulations is a physical impossibility,' or when State law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 606–07, 111 S.Ct. 2476, 2482, 115 L.Ed.2d 532 (1991).

Congress intended to establish a "cooperative federalism" through the IDEA. *See Town of Burlington v. Dept. of Educ. of Massachusetts,* 736 F.2d 773, 785 (1st Cir. 1984), *aff'd sub nom. Burlington Sch. Comm. v. Dept. of Educ.* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The court in *Burlington* described this concept, stating:

Compliance with the minimum standards set out by the federal act is mandatory for the receipt of federal assistance, (but) the act does not presume to impose nationally a uniform approach to the education of children within a given disability; it requires only that a "free appropriate education," 20 U.S.C. § 1412(1), in conformity with the state's educational standards, 20 U.S.C. §§ 1401(1), 1412(6), be provided to each disabled child upon individualized evaluation and planning.

736 F.2d at 784 (citations and footnotes omitted). Thus, IDEA does not preempt

state law if the state standards meet the minimum federal guidelines. However, IDEA "does preempt state law if the state standards are below the federal minimum." *Amelia County Sch. Bd. v. Virginia Bd. of Educ.*, 661 F.Supp. at 893–94 (E.D.Va. 1987).

*Evans v. Evans*, 818 F.Supp. 1215, 1223–24 (N.D.Ind.1993) (citations partially omitted).

■ Thus, the rule is that the IDEA preempts state law only if the state standards are below the federal minimum. *Id.; Amelia County,* 661 F.Supp. at 893–94; *Antkowiak v. Ambach,* 838 F.2d 635, 641 (2nd Cir.1988) ("While state procedures which more stringently protect the rights of the handicapped and their parents are consistent with the [IDEA] and thus enforceable, those that merely add additional steps not contemplated in the scheme of the Act [2] are not enforceable.") *c.f. Mrs. C. v. Wheaton,* 916 F.2d 69, 73 (2nd Cir.1990) ("the [IDEA] incorporates state substantive standards as the governing federal rule only if they are consistent with, and at least as exacting as, the [IDEA] provisions").

■ The federal regulations implementing the IDEA provide:

As used in this part, the term "parent" means a parent, a guardian, a person acting as a parent of a child, or a surrogate parent who has been appointed in accordance with Section 300.514. The term does not include the State if the child is a ward of the State.

34 CFR § 300.13

The note to 34 C.F.R. § 300.13 provides: Note: The term "parent" is defined to include persons acting in the place of a parent, such as a grandmother or stepparent with whom a child lives, as well as persons who are legally responsible for a child's welfare.

The federal regulations further provide:

(a) General. Each public agency shall ensure that the rights of a child are protected when—

(1) No parent (as defined in § 300.13) can be identified;

(2) The public agency, after reasonable efforts, cannot discover the whereabouts of a parent; or

(3) The child is a ward of the State under the laws of that State.

(b) Duty of public agency. The duty of a public agency under paragraph (a) of this section includes the assignment of an individual to act as a surrogate for the parents. This must include a method: (1) For determining whether a child needs a surrogate parent, and (2) for assigning a surrogate parent to the child.

(c) Criteria for selection of surrogates.

(1) The public agency may select a surrogate parent in any way permitted under State law.

(2) Public agencies shall ensure that a person selected as a surrogate—

(i) Has no interest that conflicts with the interest of the child he or she represents; and

(ii) Has knowledge and skills that ensure adequate representation of the child.

(d) Non-employee requirement; compensation.

(1) A person assigned as a surrogate may not be an employee of a public agency that is involved in the education or care of the child.

(2) A person who otherwise qualifies to be a surrogate parent under paragraphs (c) and (d)(1) of this section, is not an employee of the agency solely because he or she is paid by the agency to serve as surrogate parent.

(e) Responsibilities. The surrogate parent may represent the child in all matters relating to—

(1) The identification, evaluation, and educational placement of the child; and

---

**2.** The Education for All Handicapped Children Act, 20 U.S.C. § 1401 et seq., (EHA) was renamed, by amendments enacted in 1990, to the Individuals with Disabilities Education Act (IDEA). To avoid confusion, this order uses only IDEA.

(2) The provision of FAPE to the child. 34 CFR § 300.514

The Wyoming Rules and Regulations contain the following definitions:

> **"Person acting as a parent of a child"** means relative(s) of the child or private individuals allowed to act as parents of a child by the child's natural parents or guardians. *It does not include any persons or agencies supported in whole or part by public funds to care for the child such as a foster parent.* For example, a grandparent, neighbor, governess, friend, or private individual caring for the child with the written approval of the child's natural parent or guardian would qualify as "a person acting as a parent of a child." If a child is represented by such a person, no surrogate parent is needed.

Wyoming Rules and Regulations, Appendix A at p. 81 (underlined emphasis added).

In support of the School District's demand for remand is that it has pleaded its declaratory relief complaint very narrowly and asks for a construction of its authority only under the Wyoming Rules and Regulations.

The School District contends that there is no conflict between the Wyoming Rule and the federal regulations because 34 CFR § 300.514(d)(1) provides: "A person assigned as a surrogate may not be an employee of a public agency that is involved in the education or care of the child." According to the School District, this is the same thing as the Wyoming Rules' provision that defines "person acting as a parent" to exclude: "any person or agencies supported in whole or part by public funds to care for the child such as a foster parent."

However, this court does not construe receiving public funds as the same thing as being in the employ of 'a public agency such as the School District and therefore rejects petitioner's attempt to reconcile the regulations on that basis.

In this case A.B. contends that the state regulation conflicts with the IDEA, and therefore is preempted by the IDEA because under the state standard he is being denied the procedural protection of being represented by those who are acting as his parents.

In support of this position, intervenor cites *Fayetteville Perry Local Sch. Dist., supra.* In *Fayetteville* the School Board appealed from a state agency's order requiring reimbursement of parents of handicapped children for private school costs and related expenses. The parents removed the appeal to federal court and the school district sought remand to the state court. Applying the artful pleading exception to the well-founded complaint rule, the federal district court determined that the federal statute, the IDEA, provided better procedural protections for litigants than did the state law at issue and declined to remand.

It does not appear that *Fayetteville* case is directly on point and therefore it is not that helpful. Its dicta does provide some support for intervenor's position.

Nonetheless, the court finds that the history of this case supports intervenor's position that there is a federal question involved in the dispute over his surrogate parent. It is important to note that the issue of the respondents' problems with the School District's appointment of the surrogate parents, including the issues of whether the appointment comported with the IDEA and supporting regulations was raised *before* this action was commenced; and was always raised in connection with the failures of the School District to provide the services mandated by federal law.

For example, the April 28, 1997, letter from Protection and Advocacy on A.B.'s behalf raised this specific issue of the Wyoming Rule's conflict with a federal agency's interpretation of the federal regulation. Intervenor's Ex. H at p. 1. That letter informed the School District that a complaint may be filed if an acceptable person was not appointed as surrogate parent.

Under the IDEA, the School District is required to provide procedures to present complaints with respect to any matter relating to the "evaluation, or educational placement of the child, or the provision of a free appropriate public education of the child." 20 U.S.C. § 1415(b)(1)(E). Under these procedures, intervenor and respondents were entitled to an impartial hearing process on

their complaints. 20 U.S.C. § 1415(c). If they were aggrieved by the findings and decision made in that hearing process they were entitled to bring their complaints under the IDEA directly to federal court.[3] 20 U.S.C. § 1415(e). Thus, barely a month before this lawsuit was filed intervenor and respondents had made a clear complaint implicating concerns that the Wyoming Rules conflicted with the federal regulations implementing the IDEA and that A.B. would be deprived of important rights under the IDEA as a result of the School District's position regarding the Wyoming Rules and Regulations. Intervenor and respondents were entitled to take this complaint implicating rights under the IDEA through the administrative grievance procedures and then directly to federal court. Intervenor and Respondents could not have filed this action without first exhausting their administrative remedies. However, by filing this action, the School District has bypassed that entire administrative grievance process. More importantly, by filing this complaint for declaratory relief artfully pleaded in such a way that only the narrowest part of the parties' extant dispute over the surrogate parent issue is the subject of the complaint, the School District has effectively deprived intervenor and respondents of the federal forum available to them under the IDEA.

Accordingly, the court finds that there is a federal question involved in this case. There is a conflict between A.B.'s rights to be represented by those acting as his parents as provided in the federal regulations and the prohibition against this possibility contained in the Wyoming Rules and Regulations.

The court finds that intervenor's and respondents' failure to exhaust their administrative remedies is excused due to the School District's action in filing suit to obtain a state court declaration of its rights before respondents and intervenor could proceed through the dispute resolution procedures provided pursuant to the IDEA.

Therefore, the court will deny petitioner's Motion to Remand.

## V. CROSS MOTIONS FOR SUMMARY JUDGMENT

 Both sides move for summary judgment. The School District on the basis that it was required to, and did, appoint a surrogate parent for A.B. The intervenor on the basis that there is no longer authority or a need for the School District to appoint a surrogate parent for A.B. The parties' respective positions boil down to their dispute over which subsection of Section 41 of the Wyoming Rules and Regulations was the basis for the October appointment of a surrogate parent.

The Wyoming Rules and Regulations provide:

> ***Section 41. Surrogate Parents.*** A surrogate parent, when representing the child's educational interests, has the same rights as those accorded to parents.
>
> **(a) Appointment.** Surrogate parents are appointed by the public agency when:
>
> **(i)** a child is a ward of the state (including a ward of the court or of a state agency) *and all parental rights have been revoked;* or
>
> **(ii)** the public agency is unable to locate a parent or guardian or a person acting as a parent *through telephone calls and visits and* the agency receives no response within 20 work days to a certified letter; or
>
> **(iii)** a parent or guardian voluntarily states in writing, that the public agency has permission to appoint a surrogate....

In its definition section found in Appendix A, at pages 82 and 83, the Wyoming Rules and Regulations contain the following definitions:

> **"Parent"** means a parent, guardian, or person acting as a parent of a child, or a

---

**3.** They can choose either state or federal court. 20 U.S.C. § 1415(e)(2) ("action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy."). As noted in the *Rabinowitz case,* one reason to choose the federal forum is because the statute authorizes the federal court to hear evidence in addition to the administrative record. *Id.*

surrogate parent who has been appointed in accordance with these regulations.

. . .

**"Person acting as a parent of a child"** means relative(s) of the child or private individuals allowed to act as parents of a child by the child's natural parents or guardians. *It does not include any persons or agencies supported in whole or part by public funds to care for the child such as a foster parent.* For example, a grandparent, neighbor, governess, friend, or private individual caring for the child with the written approval of the child's natural parent or guardian would qualify as "a person acting as a parent of a child." If a child is represented by such a person, no surrogate parent is needed.

. . .

**"Surrogate parent"** means an individual appointed to protect the rights of the child who may represent the child in all matters relating to a free appropriate public education including identification, evaluation and educational placement.

*Id.* (underlined emphasis added).

The School District says that it appointed a surrogate parent under either subsection (a)(i) or (a)(ii) of Section 41. Subsection (a)(i) of Section 41 of the Rules and Regulations allows appointment when the child is a "ward of the state (including a ward of the court of a state agency)." Subsection (a)(ii) allows appointment when the School District is unable to locate the parents or a person acting as a parent.

According to the School District, the fact that A.B. is a ward of a state mandates the appointment of a surrogate parent. In addition, the School District says that because it didn't successfully locate A.B.'s mother or father, subsection (a)(ii) is "potentially applicable."

As noted above, the School District contends that there is no conflict between the Wyoming Rules and Regulations and the federal regulations because the federal regulation's provision that "a person assigned as a surrogate may not an employee of a public agency that is involved in the education or care of the child" is the same thing as the Wyoming Rules' provision that defines "person acting as a parent" to exclude: "any person or agencies supported in whole or part by public funds to care for the child such as a foster parent." The court has already rejected this argument, *supra*.

Intervenor and the Connecticut DCF say that the appointment was pursuant to subsection (a)(iii) of § 41, which allows appointment when the guardian [DCF] voluntarily states in writing that the public agency has permission to appoint a surrogate.

Intervenor contends that the permission has now been revoked, first by the social worker who initially gave permission, and later by the Connecticut Juvenile court. Therefore, he contends there is no longer a basis for the School District to appoint a surrogate parent.

Intervenor also contends that subsection (a)(ii) is not applicable because the undisputed evidence shows that (1) the parental rights of the natural parents have not been terminated and (2) there were no reasonable efforts by the means provided in the Rule—telephone calls and visits—to find the mother whose whereabouts were known to the foster parents.

Intervenor contends that this court should find, on the unique circumstances of this case, that as a matter of law his foster parents should be regarded as persons "acting as a parent of a child" for all purposes under the IDEA—a finding that would eliminate the need to appoint a surrogate parent.

In support of this position, intervenor cites *Rabinowitz v. New Jersey State Board of Education*, 550 F.Supp. 481 (D.N.J.1982). In *Rabinowitz*, the child was placed in long-term foster care in another state because her parents couldn't care for her. The child had a devoted and supportive foster mother under whose long-term care she had benefited. The parents filed suit to force the state where she was in foster care to provide an education. The court found the state was required to provide an education for the child. In dicta, the court noted that the regulations made provisions for a handi-

capped child who is not living with her parents or a legally appointed guardian to have her procedural rights safeguarded by a person such as her foster mother who was "acting in the place of a parent."

An authority more directly on point is *Criswell v. State Dept. of Ed. Docket*, reported at 1986–87 EHLC DEC. 558:156 (M.D.Tenn.1986). In *Criswell* the disabled child was living with his permanent foster family. Adoption had been attempted but it was decided it was not in the best interest of the child because it would result in the loss of government support necessary for his medical care. After the foster parents, acting as the child's parents, requested a hearing on a disputed issue of his educational needs, the school district appointed a surrogate parent. The *Criswell* court held that on the facts of the case the foster parents were persons acting as parents for purposes of 34 CFR § 300.13 and therefore a surrogate parent had been needlessly appointed.

Finally intervenor contends that allowing his foster parents to act as his parents would be in conformity with the proposed amendment to C.F.R. § 300.13 (Federal Register, October 22, 1997, Vol. 62, No. 204, p. 55071). The proposed amendment would permit States to recognize foster parents as persons acting as parents in circumstances such as A.B.'s case. *Id.*

The School District opposes A.B.'s foster parents acting as parents as contrary to the Wyoming Rules and Regulations. In support of its position it cites to the Wyoming Attorney General's Memorandum wherein reliance on *Criswell* was pronounced "risky" because of a perceived lack of analysis.

The School District also cites to two OSEP letter decisions,[4] plus materials prepared for a seminar.

In *Letter to Baker*, 20 Individ. With Disab. Educ. Law Rptr., 1169 (1993), OSEP

considered whether foster parents could be considered as "acting as a parent," rendering the appointment of a surrogate parent unnecessary. OSEP opined that foster parents *could*, under certain circumstances be recognized as a parent, making it unnecessary to appoint a surrogate parent. However, the decision should be made on a "case-by-case basis in light of the particular facts and circumstances, including applicable requirements of State law" regarding the status of foster parents. *Accord, Letter of Hargan*, 16 EHLR 739 (1990) (advising that permanent foster parent could act as parent within the meaning of the federal regulations even though the foster mother was a part-time employee of school district).

In *Baker*, OSEP also opined that the regulations do not require that the State recognize the foster parents as acting as parents and the willingness of the foster parent is not sufficient to establish their right to act as a parent for purposes of the IEP.

The School District also cites *Letter to Thompson*, 23 Indiv. With Disab. Educ. Law Reptr. 890, as authority for their position that under the federal regulations a surrogate parent must be appointed when a child is the ward of the state. *Thompson* opines that where the foster family's sole source of income is the compensation for its foster children, the state agency must conduct a determination of whether there is a conflict of interest. Similarly, OSEP opines that where an individual's sole source of income is the foster children payments, the state agency should also conduct an determination of whether that individual should be considered an employee of the state agency.

The seminar materials cited by the School District take the same position as the *Baker Letter*: the state is not compelled to recognize foster parents as persons "acting as parent" for the purposes of the regulation.

---

4. *Baker* and *Hargan, infra*, are letters from OSEP interpreting the IDEA. OSEP is the Department of Education's Office of Special Education Programs—the federal government entity which is responsible for administering the IDEA. An agency's interpretation, found in federal regulations, of a federal statute such as IDEA, is entitled to "great deference." *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 898 n. 3 (10th Cir. 1997) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). However, the same deference is not given for interpretative guidance promulgated under the Administrative Procedures Act. *Id.*

The School Board also contends that under the regulations and under *Baker,* the eligibility of foster parents to act as parents or to be appointed as a surrogate parent, is dependent upon state law. Ordinarily this is true. However, as noted above, in *Mrs. C. v. Wheaton,* 916 F.2d 69, 73 (2nd Cir.1990), the court held that where the IDEA "incorporates state substantive standards as the governing federal rule, it does so only if the state standards are consistent with, and at least as exacting as," the IDEA provisions.

This court rejects the School District's position that *Criswell* is not persuasive authority. The court finds it persuasive and adopts its reasoning.

The court finds that the School District acted appropriately when it appointed a surrogate parent in October. However, problems developed and the child did not receive the timely IEP and other procedures. Whether it was the result of a lack of an effective surrogate parent or not, the system broke down. The child's guardian, the Connecticut DCF, the entity footing the entire bill for the child's education, then revoked its consent to the appointment of that surrogate parent and clearly expressed its desire for different surrogate parent.

The School District, having failed to follow the Rules and Regulations with regard to the timing of evaluations and the development of an educational plan for A.B. and having failed to follow the Rules and Regulations with regard to attempts to notify the parents by visits and phone calls, and having ignored the Rules and Regulation specifying that a surrogate parent may be appointed for a ward of the state only if parental rights are terminated, then decided to stand on the letter of Rules and Regulations and oppose allowing A.B.'s foster parents to act as his parents or allowing them to be appointed as surrogate parents.

This court finds and concludes that on the specific facts of this case, there is a conflict between state and federal law. Therefore, federal law and regulations should govern the issue before the court. Under federal law and regulations there is no impediment to the foster parents "acting as" A.B.'s parents for all purposes under the IDEA. The undisputed evidence of E.F.'s affidavit is that her family wants to adopt A.B., and that they consider him part of their family.

As noted in Mr. Howard's April 30, 1997 letter, and as reiterated at the hearing in this matter, the School District has no objection to the foster parents, other than its interpretation of the Wyoming regulations.

A.B.'s foster parents, in particular his foster mother E.F., have shown dedication and persistence in the quest for an appropriate education for A.B. His foster parents know him, his problems and his needs. His foster parents are in fact his family, biologically as well as by choice.

Under the specific facts of this case the court finds that A.B.'s foster parents are acting as his parents within the meaning of 20 U.S.C. § 1415(b)(1), 34 C.F.R. §§ 300.13 and 300.514, and the Wyoming Rule and Regulations Section 41, and therefore there is no need for the School District to appoint a surrogate parent.

As to the Order of the Connecticut Juvenile court—the Order does not purport to appoint Ms. Pratt as surrogate parent. Instead, the Order revokes the previous consent to appoint a surrogate—which the guardian is surely entitled to do. And the Order appoints Ms. Pratt as "agent" for the child in Wyoming for all purposes including but not limited to IEPs.

Accordingly, there is no need for this court to address the petitioner's request that this court declare the order "of no effect" because that Order does not direct petitioner to take any action. It is therefore

ORDERED that petitioner's Motion to Remand is **DENIED.** It is further

ORDERED that petitioner's Motion for Summary Judgment is **DENIED.** It is further

ORDERED that intervenor A.B.'s Motion for Summary Judgment is **GRANTED.**

The court will enter a separate judgment.