**SARAH M., et al., Plaintiffs,**

v.

**Jerry D. WEAST,[1] et al., Defendants.**

**No. Civ. 99–3010.**

United States District Court,
D. Maryland,
Southern Division.

July 25, 2000.

1. Defendant Weast is sued in his capacity as Superintendent of the Montgomery County Public Schools. Defendant Montgomery County Board of Education administers MCPS. Defendants will be referred to collectively as "MCPS."

Michael J. Eig, Holly Lynn Parker, Eig, Parker & Starbuck, Washington, DC, for Plaintiffs.

Jeffrey A. Krew, Columbia, MD, for Defendants.

## OPINION

MESSITTE, District Judge.

Pursuant to the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et. seq.*, the parents of Sarah M. seek reimbursement for the costs they incurred in educating her in a private school for disabled children. An administrative law judge ("ALJ") found that the parents failed to give notice to the Montgomery County Public School ("MCPS") authorities as required by law and granted the school authorities' Motion to Dismiss.

Before the Court, the parents argue that the notice they gave was appropriate.[2] The Court agrees, reverses the decision of the ALJ, and remands the case for further proceedings.

### I.

Sarah M. is a child with multiple disabilities including learning disabilities, speech and language deficits, and sensory integration issues. She is eligible to receive special education and related services as required by the IDEA. During the 1996–97 school year, Sarah attended kindergarten at Bradley Hills Elementary School in Montgomery County. In the summer of 1997, at the request of Sarah's parents, MCPS convened an Admission, Review and Dismissal ("ARD") meeting for the purpose of reviewing Sarah's needs and proposing a placement for the 1997–98 school year. As a result of that meeting,

---

**2.** The parents also argue that MCPS failed to advise them of the notice requirements under federal and Maryland law, thus making the notice requirements inapplicable. *See Carnwath v. Bd. of Educ. of Anne Arundel County,* 33 F.Supp.2d 431 (D.Md.1998). In light of the Court's ruling, this argument is moot.

The parents further ask for reimbursement on the merits on the grounds that the County's proposed individualized education program ("IEP") placement was inadequate as a matter of law. The Court declines to address the merits argument, which will be considered by the ALJ on remand.

she was assigned a disability code of 10, indicating multiple disabilities, and a 1997–98 IEP was developed for her, to be implemented in the pre-academic program at Bannockburn Elementary School, also in Montgomery County.

Sarah pursued her plan during the 1997–98 school year at Bannockburn, dividing her time between a special education pre-academic class and mainstream education in the regular first grade class.

In January 1998, because they were dissatisfied with her educational progress, Sarah's parents commissioned independent psychoeducational testing to determine her educational needs and concluded that Sarah needed more intensive services than she was receiving in the pre-academic program at Bannockburn. Their expert suggested that, in addition to working with MCPS, the parents should explore the possibility of private school for students with learning disabilities, recommending, among others, the Lab School of Washington, D.C.

In January 1998, Sarah's parents submitted an application for her to attend the Lab School beginning the September 1998 term. At the same time they continued to work with the Bannockburn staff to develop an appropriate program for Sarah within the MCPS system. Sarah's teachers knew that her parents were pursuing the possibility of placing Sarah at the Lab School; indeed, at the parents' request, Sarah's teacher sent the Lab School an assessment of Sarah.

On April 20, 1998, MCPS convened an ARD meeting for the purpose of discussing Sarah's educational performance and proposing an IEP placement for the 1998–99 school year. At the meeting, Sarah's parents presented MCPS with a copy of their expert's psychoeducational report, but because MCPS's psychologist was not present, MCPS requested that the meeting be continued to a later date so that their psychologist might review the report. Sa-

rah's parents agreed to continue the ARD meeting to May 20, 1998 and limited their discussion at the April 20 meeting to Sarah's educational performance.

On May 4, 1998, without advising MCPS, the parents signed an "enrollment contract" with the Lab School of Washington "to reserve a place for Sarah ... for the academic year 1998–99."

The contract was signed "on the following conditions," among others:

1) You agree to pay a total of $16,895.00 for the academic year program. You agree to pay a non-refundable tuition deposit of $ 1,000.00 by May 11, 1998 to hold the place ...

2) You agree that if for any reason your child is withdrawn from the Lab School after June 30, 1998, you will remain responsible for the tuition until such time as the Lab School is able to fill the space with an appropriate student. If, when the space is filled, the tuition payments exceed the appropriate prorated amount, the remainder, minus the original non-refundable deposit of $1,000.00, will be refunded to you.

The parents paid the $1,000 deposit at that time.[3]

On May 20, 1998, the ARD meeting reconvened. At the meeting, MCPS proposed to implement Sarah's 1998–99 IEP in an intensity IV program back at Bradley Hills Elementary. The program consisted of a self-contained special education class with mainstreaming into the general school population. Sarah's parents declined to sign the proposed IEP and on May 27, 1998 sent a letter to Bannockburn's principal Jane Butler setting forth their objections. Not having received a reply, the parents informed Principal Butler, by letter dated July 8, 1998, of their "intention to enroll Sarah in a private school at public expense beginning in September 1998."

---

**3.** By June 30, 1998, they had paid a total of approximately $12,000.

On July 14, 1998, the parents received a letter from MCPS dated May 28, 1998, following up on the May 20,1998 ARD meeting.[4] In it, MCPS requested that the parents sign the proposed 1998–99 IEP. The parents returned the form, stating that they would not sign and no further progress was made with regard to an IEP for Sarah for the 1998–99 school year. In September, she began to attend the Lab School.

On January 27, 1999, the parents requested a due process hearing to address what they believed was the failure of MCPS to provide Sarah a "free appropriate public education" ("FAPE"). Prior to the hearing, however, MCPS filed a Motion to Dismiss based on the parents' failure to give MCPS written notice prior to enrolling Sarah in private school, as required by state law. The ALJ granted the Motion. Her finding forms the principal basis of the parents' appeal to this Court. The parties present their arguments by way of Cross–Motions for Summary Judgment.

## II.

In *Doyle v. Arlington County School Bd.*, 953 F.2d 100 (4th Cir.1991), the Fourth Circuit, following *Board of Education v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), discussed the "due weight" a district court must give to state administrative proceedings in IDEA cases. Findings of fact of the hearing officer are considered *prima facie* correct, *Doyle*, 953 F.2d at 105, and deference is also due the hearing officer's findings as to the school authority's compliance with the IDEA's procedural requirements. *Id.* at 106, n. 6. Deference, however, has its limits. As the Fifth Circuit held in *Teague Independent School District v. Todd L.*, 999 F.2d 127, 131 (5th Cir.1993):

**4.** · Although the letter was dated May 28, 1998, it had apparently been twice returned for

"Although the district court is directed by the statute to give the [ALJs' factual] findings "due weight," the statute does not state that the district court must defer to those findings when its own review of the evidence indicates that [the administrative fact finder] erroneously assessed the facts or erroneously applied the law to the facts."

*See also Tice v. Botetourt County School Bd.*, 908 F.2d 1200 (4th Cir.1990); *Hudson v. Wilson*, 828 F.2d 1059 (4th Cir.1987).

## III.

The relevant statutory notice provisions in this case are these:

*Under the IDEA:*

20 U.S.C. § 1412(a)(10)(C)(iii), effective June 4, 1997, provides in pertinent part:

The cost of reimbursement [for a unilateral private school placement] described in clause (ii) may be reduced or denied:

(1) if—

(aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

(bb) 10 business days (including holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in division (aa); . . .

*Under Maryland law:*

MD.CODE ANN., EDUCATION § 8–413(i) (1999), effective October 1, 1996, provides in pertinent part:

insufficient postage.

If the parent or guardian of a student with disabilities, eligible to receive special education and related services from a county board, enrolls the child in a non-public school, the county board is not required to reimburse the parent or guardian for tuition or related costs associated with the enrollment if:

(1) The parent or guardian does not provide the county board prior written notice rejecting the program proposed by the county board, including the reason for rejection, and stating an intention to enroll the student in a non-public school.

The ALJ found the Maryland statute controlling and dispositive. The provision, she held, "obligates the parents of children seeking private school tuition reimbursement to give advance notice to the school system not only of the removal of a child from the public school placement, but, specifically, of the reasons for rejection of the proposed placement." She saw no conflict between the state provision and the rights of the parents under the IDEA, hence no preemption of the state statute by the federal. Reasoning that the purposes of the statutes do not conflict, she concluded that the state law stands as no "obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and that the statutes "share a common purpose—to limit parental rights to tuition reimbursement for private school placement by requiring the parents to affirmatively act to give prior notice to the school systems involved in order to qualify."

She went on:

Clearly, the intent of both statutes is to provide the school systems the opportunity to respond to concerns raised by the parents in the notice, and to allow for an opportunity to explore other services or placements which may resolve the issues raised. Some logical goals of both statutes include: creation of a clear record, elimination of some factual disputes, less chance for confusion, misinterpretation or misunderstanding of the

parents' intentions, and it encourages the parents to be forthcoming in their dealings with school boards. Additionally, the school staff is not left with the arduous task of pouring [sic] over minutes of ARD meetings to isolate comments by parents and, determine whether those comments rise to the level of notice of rejection and intent of private placement.

The ALJ rejected the argument that, because the Maryland statute fails to offer parents the option of giving either oral or written notice, the Maryland statute is more restrictive and thus unenforceable. This, in her view, would exalt form over substance since the manner of notice is "only incidental to the shared, primary goal of both statutes." She concluded that Maryland's statute "works in concert with the federal statute and helps to achieve its aim."

## IV.

Based on its interpretation of the plain meaning of the word "enroll," MCPS contends that § 8–413(i)(1) requires that written notice must be given prior to placing a child's name on a register for future attendance at a private school. Although the Maryland statute does not say so, MCPS also appears to argue that the ten business days prior written notice requirement of the federal statute should be grafted onto the Maryland statute such that, in view of the school authorities, the parents must give at least that many days' notice before placing the child's name on a register for future attendance at a private school.

Further, although its position is not entirely clear, MCPS appears to believe that the federal statute is fully in harmony with the state statute, *i.e.* that the federal requirement of written notice ten business days prior to the child's "removal" from public school means the same thing as ten business days prior to her "enrollment" in the private school, which is to say prior to

the act of inscription, whenever that might occur. Because the parents in this case failed to give notice ten business days prior to signing the enrollment contract with the Lab School, the argument goes, they are precluded from seeking reimbursement. In contrast, the parents argue that their July 8, 1998 letter satisfied the IDEA's written notice requirement because it came more than ten business days before Sarah was actually to be removed from MCPS.

It is undisputed that the July 8, 1998 letter establishes that Sarah would not be attending public school in the fall term. What the parents say is that since Sarah was physically in attendance at Bannockburn Elementary on May 4, 1998, and since she completed the spring term there with the prospect of continuing public school attendance in the fall,[5] she was not "removed" from MCPS until she actually began attending private school in September 1998. Thus, their July 8 letter was sent more than "ten business days … prior to the removal of the child from the public school." Although they concede the term "enroll" is ambiguous, they take issue with any interpretation of the Maryland statute that requires written notice to be given in advance of merely inscribing a child for possible attendance at private school at a later date. They dispute that Sarah "was enrolled in the Lab School on May 4, 1998, two months prior to the July 8, 1998 notice" because she was in fact still "enrolled" at Bannockburn on May 4. At the same time, they suggest that "removal of the child from public school" in the federal statute cannot possibly mean the same thing as putting down a deposit (even a substantial one) with a private school to hold a place for a child's possible later attendance. Thus, they say, any suggestion that "removed" means the same thing as "enrolled," in the way MCPS interprets "enrolled" is unreasonable. More fundamentally, they argue that, to the extent Maryland's requirement of written notice prior to enrollment conflicts with the federal statute's requirement of notice ten business days prior to removal, the state statute is preempted by the federal.

## V.

What the ALJ did not do and what MCPS has yet to do is define the terms "enroll" in the state statute and "removal" in the federal statute and attempt to harmonize them. The parties agree that neither the state nor federal statute defines the terms.

Dictionary definitions provide a beginning. *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1214 (1983) defines "removal" as "the act of removing" and "remove" as to "move from a place or position, among other things." "Enrollment," as defined by the same dictionary, is "the act or process of enrolling" and "enroll" is defined as "to write (a name), or insert the name of (a person), in a role or register; place upon a list." *Id.* at 475. However, in ordinary parlance "remove" bespeaks a physical action and would seem, unless the context clearly indicates otherwise, to suggest a present and not a future action. At the same time "enrolled," while it may refer to the act of inscription alone, is also commonly understood to mean physically present as well as inscribed. A college, for example, may report the number of students presently "enrolled" on its campus or "enrolled" in one or more of its courses.

In light of this, it is hard to find fault with the proposition that Sarah was not "removed" from public school on May 4, 1998 when her parents signed the enrollment contract with the Lab School. She was every bit as much "enrolled" at Bannockburn and MCPS on that date as she

---

**5.** The IEP proposed that Sarah be transferred back to Bradley Hills Elementary for her 1998–99 program. Sarah and her parents received a number of mailings from Bradley Hills during the summer of 1998, including information regarding transportation arrangements and a welcome package for new students.

was at the Lab School, where she was inscribed to attend some months later. It is particularly difficult to conceive of a child as "enrolled" in a private school and "removed" from a public one when her parents remain uncertain whether the child will eventually be placed in the private school, even though in the meantime they may act to preserve the private school option and sign an enrollment contract. Any suggestion that the signing of the enrollment contract for a private placement equals "removal" is unpersuasive. A parent fairly committed to private school and willing to assume liability for a substantial financial commitment may still be disposed to reconsider.[6]

School authorities undoubtedly have good reason to want to know what the parents intend for their child. But the point is that defining enrollment in terms of the mere act of registering or inscribing the child in private school is problematic. It makes sense to equate actual physical enrollment in private school with actual physical removal from public school. In that case, the notice of intended enrollment in the one and intended removal from the other relate to reasonably certain events, events not only likely to occur but likely to occur more or less simultaneously. On the other hand, equating "removal of the child from the public school" with the act of inscribing the child in a private school several weeks or months earlier for possible attendance several weeks or months later at the very least tortures the meaning of the word "removal."

■ But MCPS insists that "to enroll" means to inscribe, presumably accompanied by some sort of deposit, but not nec-

essarily by physical presence. If that is the definition that MCPS gives to "enroll," the Court will accept it. But the fact remains that the federal statute speaks in terms of "removal." It does not tie the required notification to an occurrence at the private school (the act of inscription) but to an occurrence at the public school (the act of removal). Moreover "removal" implies a present or at least an imminent physical action. The Court therefore concludes that "removal" in the federal statute pertaining to prior notice requirements refers to the actual physical removal of the child from public school. If the removal occurs during the school year, the ten business days count back from the date of the intended actual physical removal. If the decision to enroll in private school occurs during a summer recess, the ten business days mark from the beginning of the public school year (or sooner if the child is physically placed in private school).

Given this interpretation, an obvious inconsistency exists between the state and federal statutes. "Enrollment" under the state statute occurred on May 4, 1998 and no prior written notice was given. "Removal" under the federal statute occurred in September 1998, and written notice was given more than 10 business days in advance.

The Court must therefore consider whether the federal statute is preemptive.

## VI.

■ "Under the Supremacy Clause of the Federal Constitution, '[t]he relative importance to the State of its own law is not material when there is a conflict with a

---

**6.** But ultimately whether parents have a truly open mind about the matter is not the test. Parents may be committed to private school for their child whatever the school authorities may propose. They may honestly feel that the best the school authorities can offer their child is not enough. This cannot *ipso facto* mean that the parents, as citizens and taxpayers, lose the right to seek a "free appropriate public education" for their child. So long as they make a *bona fide* effort to develop an IEP

for the child and otherwise follow appropriate procedural requirements, they can take their chances, place their child in private school, and attempt to convince an ALJ and/or court later on that the offering of the school authorities does not measure up a "free appropriate public education" for the child. *See School Committee of the Town of Burlington, Massachusetts v. Department of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

valid federal law, for any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (citing *Free v. Bland*, 369 U.S. 663, 666, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962)).[7] The critical question is whether the state requirement "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). As noted, the ALJ found that the state statute "works in concert with the federal statute and helps to achieve its aim," which she saw as giving the school system an opportunity to respond to concerns raised by the parents and to establish a time certain when a school plan is being rejected and when private placement is being pursued instead. The Court, however, takes a significantly different view. While "limitation to reimbursement absent prior notice" may be the purpose and objective of the particular state and federal statutes, the more appropriate inquiry, in the Court's view, is whether the Maryland statute stands as an obstacle to the "full" purposes and objectives of Congress. The Court believes that it does.

One of the express purposes of the IDEA is "to ensure that the rights of children with disabilities and their parents are protected." 20 U.S.C. § 1400(d)(2). *See also School Committee of Burlington*, 471 U.S. at 367, 105 S.Ct. 1996. Among the rights insured under the IDEA is the right of parents to obtain reimbursement for private school placement for any period in which the placement proposed by the school authority has violated the IDEA. *Id.* In protection of this and other rights, "Congress incorporated an elaborate set of what it labeled 'procedural safeguards' to ensure full participation of the parents." *Id.* at 368, 105 S.Ct. 1996. These include the right to examine records, to obtain an independent evaluation of the child, to present complaints, to have a "due process hearing to resolve complaints, and to seek review of an adverse administrative decision in state or federal court." *Id.*

Congress of course could provide that several factors must be taken into account that affect possible parental reimbursement for unilateral private placements of their child:

> Parents must give notice about their concerns and intent at the most recent IEP meeting or written notice 10 days before they transfer the child to the private school. Prior to removal of the child from the public school, if the public agency informed the parents of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), the parents must make the child available for such an evaluation. If the parents do not comply with notice and evaluation requests or engage in unreasonable actions, hearing officers and courts may reduce or deny reimbursement to parents for unilateral private placements.

H.R.REP. No. 104-95, at 89, *reprinted in* 1997 U.S.C.C.A.N. 89.

But Congress also could and did designate the last date on which the parents are required to give notice of the "removal" of the child from the public school and her transfer to a private one before they lose the right to seek reimbursement. That date is set at ten business days prior to the removal. While the deadline may operate as a restriction on the parents for the benefit of the school authorities, looked at from another standpoint it also establishes the parents' right to delay up to a certain point, perhaps to weigh their options, without having to give notice and without forfeiting their claim.

---

7. In *Felder*, the Supreme Court, finding preemption, reversed the dismissal of a plaintiff's state court action under 42 U.S.C. § 1983 because of his noncompliance with the state's requirement of written notice of the claim within 120 days of the injury.

On the other hand if a state statute requires that, unless notice is given on a sooner occasion, forfeiture of the right will follow, the state requirement necessarily truncates the federal right.

Numerous courts have found that the IDEA preempts state law when the state standard conflicts with the federal. *See, e.g., Hacienda La Puente Unified School Dist. v. Honig,* 976 F.2d 487, 496 (9th Cir.1992) (failure to comply with state statute requiring notice of claim of attorney's fees may not bar claim for attorney's fees under IDEA); *Antkowiak v. Ambach,* 838 F.2d 635, 641 (2nd Cir.1988) (state statute permitting state review of unappealed decision of hearing officer violates finality provision of Education for All Handicapped Children Act's (EHA)[8]; *Doe ex rel. Gonzales v. Maher,* 793 F.2d 1470, 1485–6 (9th Cir.1986) (state statute allowing indefinite suspension or expulsion of disabled student during administrative proceedings violates EHA's stay-put provision allowing child to remain in current placement); *Converse County School District No. 2 v. Pratt,* 993 F.Supp. 848, 860 (D.Wyo.1997) (state rules and regulations prohibiting foster parents from acting as surrogate parents for IEP purposes violates IDEA's federal regulations); *Bray By Bray v. Hobart City School Corp., et al.,* 818 F.Supp. 1226, 1230 (N.D.Ind.1993) (state procedure governing residential placement applications, which allowed state to review hearing officer's decision even if no appeal taken, violates IDEA); *Evans v. Evans,* 818 F.Supp. 1215 (N.D.Ind.1993) (state procedures requiring additional application and review process resulting in delay in obtaining residential placement violates IDEA); *Amelia County School Board v. Virginia Board of Education,* 661 F.Supp. 889, 893–94 (E.D.Va. 1987) (state procedure for review of administrative proceedings that was substantially identical to procedure under EHA does not violate the Act); *Township High*

*School District No. 211 v. Mrs. V.,* 1995 WL 103667, at \*3 (N.D.Ill.1995) (state statute providing two-tier state hearings does not offend IDEA); *see also Mrs. C. v. Wheaton,* 916 F.2d 69, 73 (2d Cir.1990) (state standard of legal competency for purposes of waiving IDEA's procedural safeguards could not apply because it would be less exacting than federal provision).

As in *Hacienda, supra,* the Maryland statute is a "notice of claim" statute. Such provisions have been deemed to "significantly inhibit the ability to bring federal actions." *Brown v. United States,* 742 F.2d 1498, 1507 (D.C.Cir.1984). They have also been recognized as being "enacted primarily for the benefit of governmental defendants," to enable those defendants to "investigate early, prepare a stronger case, and perhaps reach an early settlement." *Felder v. Casey,* 487 U.S. at 142, 108 S.Ct. 2302 (citing *Brown,* 742 F.2d at 1506). But, as the Supreme Court has noted, while "[s]ound notions of public administration may support the prompt notice requirement, … those policies necessarily clash with the remedial purposes of federal … law." *Felder,* 487 U.S. at 145, 108 S.Ct. 2302. "A state court may not decline to hear an otherwise properly presented federal claim because that claim would be barred under a state law requiring timely filing of notice." *Id.* at 152, 108 S.Ct. 2302.

The IDEA permits parents to give notice to the public school authorities as late as ten business days prior to the actual physical removal or transfer of their child from public school without losing the right to seek reimbursement for the child's private school tuition. The Maryland statute, as interpreted by MCPS, requires the parents to give such notice at some time (apparently ten business days) prior to merely inscribing the child to attend a private school, whenever that might occur,

---

**8.** Pursuant to amendments adopted in 1990, the Education for All Handicapped Children Act ("EHA"), 20 U.S.C. § 1401 *et seq.,* was renamed the Individuals with Disabilities Education Act ("IDEA").

but frequently more than 10 business days prior to the actual physical removal of the child from public school. Whatever notions of sound public administration may support the Maryland statute, in the words of *Felder*, they necessarily clash with the remedial purposes of federal law. The state statute significantly inhibits the ability of parents to bring a federal action to obtain reimbursement for placement of their children in private schools. Ultimately it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." The Court therefore concludes that the time element of the notice requirement of Section 8–413(i)(1) of the Education Article of the *Maryland Code* is pre-empted by the IDEA provision, 20 U.S.C. § 14 12(a)(10)(C)(iii).[9]

The Court finds that the July 8, 1998 letter mailed by Sarah's parents to MCPS was timely notice under the federal statute.

## VII.

For the foregoing reasons, Defendants' Motion for Summary Judgment will be DENIED and Plaintiffs' Cross–Motion for Summary Judgment will be GRANTED. The decision of the Administrative Law Judge dated April 5, 1999 is REVERSED and the matter is REMANDED to the Administrative Law Judge for a hearing on the merits.

---

[9.] The Court addresses § 8–413(i)(1) only insofar as it requires notice at a time other than 10 business days prior to the intended actual removal of a child from public school. Plaintiffs have pointed out other possible inconsistencies between the Maryland and federal statutes including, for example, the fact that federal statute enumerates exceptions to the notice requirement whereas the Maryland

statute does not. While the Court does not pass on these other arguments, it concurs fully with the suggestion of Chief Judge Motz that "in light of the potential pre-emption problems the State would be well-advised to consider amending 8–413(i) to comport with the IDEA." *Carnwath*, 33 F.Supp.2d at 433, n. 2.